# Clarence H. Venner et al. v. Denver Union Water Co. et. al.

*District Court of Arapahoe County, June 2, 1902. No. 24,125.*

CALDWELL YEAMAN AND HENRY BABB, for plaintiff.

CHARLES J. HUGHES, Jr., for defendant, The Denver Union Water Company.

WOLCOTT, VAILE & WATERMAN and WM. M. FIELD for defendant, The Continental Trust Company.

DIXON, J.

Prior to the year 1882, the field which is now covered by the water works system operated and claimed to be owned by the Denver Union Water Company, the real defendant in this action, was occupied by several independent companies each owning its own property and operating under its own franchise. That year witnessed the first of a series of consolidations, which culminated in the formation of the present system. The history of those consolidations is somewhat complicated on account of the different methods by which they were effected and the different conditions of the various properties which were finally amalgamated.

In November, 1882, The Denver Water Company was incorporated for the purpose of effecting the consolidation of The Denver City Water Company, incorporated in 1870, and The Denver City Irrigation & Water Company, incorporated in 1878; and immediately upon its organization, these two companies conveyed to it all their property, rights and franchises of every description whatsoever. The property of The Denver City Water Company was acquired subject to a mortgage which had been executed to secure bonds to the amount of two hundred and fifty thousand dollars, and in which Carlos S. Greeley and John McManus were named as trustees.

On Jan. 14, 1890, The Denver Water Company also acquired all of the property of The Domestic Water Company, subject to a mortgage executed to secure bonds to the amount of one hundred and fifty thousand dollars. The trustees named in this mortgage were George W. Clayton and David. H. Moffat, but, at about the time of the transfer of the property, they were succeeded by James V. Dexter and Charles D. McPhee. For the sake of brevity, the bonds secured by these two mortgages will hereafter be referred to as "the underlying bonds."

For the purpose of raising funds to retire the bonded indebtedness which it had assumed, and to extend and enlarge its plant, on Jan. 15, 1890, The Denver Water Company executed and delivered to The Farmers' Loan & Trust Company of New York, a mortgage to secure bonds to the amount of two million five hundred thousand dollars, bearing interest at 7 per cent. per annum. This mortgage conveyed in terms all of the property of every description whatsoever which the Denver Water Company then owned, or which it might afterwards acquire, during the existence of the lien of the mortgage. The bonds secured by this mortgage will be hereafter referred to as "the seven per cent. bonds."

The next consolidation was effected in November, 1890, through the medium of a new corporation, called The Denver City Water Works Company. It was intended that the new company should execute a mortgage to secure a large bonded indebtedness, and for the purpose of preventing a portion of its property from being covered by the lien of such mortgage, The Denver Water Company conveyed a large quantity of real estate to James B. Grant, in

trust.   By the terms of the deed of trust, the entire
beneficial interest in said real estate was vested in
The Denver City Water Works Company.   For the
sake of brevity, this property will hereafter be re-
ferred to as "the Grant trust estate."

The residue of its property of every character and
description whatsoever, and all of its rights and
franchises, were thereafter conveyed by The Denver
Water Company to The Denver City Water Works
Company.   On November 15, 1890, The Denver City
Water Works Company executed and delivered to
the Central Trust Company of New York its mort-
gage to secure bonds to the amount of seven million
five hundred thousand dollars, bearing interest at
the rate of five per cent. per annum.   This mortgage
in terms conveyed all the property of every descrip-
tion whatsoever which The Denver City Water
Works Company then owned, or which it might af-
terwards acquire, during the existence of the lien of
the mortgage.   The bonds secured by this mortgage
will hereafter be referred to as "the five per cent.
bonds."   Subsequently The Denver City Water
Company acquired all the properties, rights and
franchises of The Mountain Water Company and
The Beaver Brook Water Company.   The proper-
ties acquired from these companies will hereafter be
referred to, respectively, as "the Mountain property,"
and "the Beaver Brook property."

In the latter part of the year 1890, a plan was
agreed upon for the consolidation of the water works
system in Denver, owned and operated by the Den-
ver City Water Works Company, and the water
works system at Omaha, owned and operated by the
American Water Works Company (of Illinois).   To

carry this plan into effect, a corporation was organized under the laws of the state of New Jersey, known as The American Water Works Company, which, on May 15, 1891, filed in the office of the secretary of state of Colorado its certificate of incorporation and a copy of the laws under which it had been incorporated, and also a certificate designating one Francis P. McManus, residing at Denver, as its authorized agent, upon whom service of process might be made. Thereafter The Denver City Water Works Company and The American Water Works Company (of Illinois) conveyed to it all their property of every description whatsoever, and all their rights and franchises. The property conveyed by The Denver City Water Works Company, for the sake of brevity, will be hereafter referred to as "the Denver plant."

There is strong ground for believing that The Denver City Water Works Company was organized in anticipation of the consolidation of the Denver and Omaha plants, which had been proposed at the time of its incorporation; and for the purpose of enabling The Denver Water Company, under a different name, to acquire the Mountain and Beaver Brook property, so as to avoid the lien of The Farmers' Loan & Trust Company's mortgage. A finding upon this question is not necessary to the decision of this case, and I refer to it here simply for the purpose of pointing out, that in any foreclosure proceedings upon the mortgages above named a serious question would be likely to arise as to whether or not the Mountain and Beaver Brook properties would be subject to the lien of The Farmers' Loan & Trust Company's mortgage under the "after-acquired

property clause" contained therein. It is also apparent that a serious question would be likely to arise as to whether or not the beneficial interest which The Denver City Water Works Company acquired in the Grant trust estate would be subject to the lien of the Central Trust Company mortgage.

The consolidation of the Denver and Omaha plants was brought about by C. H. Venner & Co., a New York firm of investment bankers, composed of William A. Underwood and Clarence H. Venner, one of the plaintiffs in this action. Upon the organization of The American Water Works Company (of New Jersey), Underwood was elected president, and Venner and Dennis Sullivan of Denver were elected vice-presidents. The management of the property of the company in the city of Denver was placed in charge of an executive committee, consisting of Underwood, Sullivan and McManus, who, in Denver, under the by-laws of the corporation, were "to have general charge of all the affairs of the company, * * * with as full control over all matters pertaining to the property as possessed by the board, except the sale or mortgage of the same."

Prior to the consolidation, extensive improvements in the Denver plant had been in contemplation, and, as shown by the articles of agreement, which were drawn up for the purpose of effecting the consolidation, the chief reason which influenced The Denver City Water Works Company to assent thereto was to secure the funds necessary to complete those improvements, and to extend and enlarge its facilities, in order that the Denver plant might successfully maintain the field as a competitor of The Citizens' Water Company.

Venner, as the managing member of the firm of C. H. Venner & Co., undertook to secure the necessary funds by negotiating the bonds issued by The Denver City Water Works Company; Underwood, as president of the company and chairman of the executive committee, remained in Denver to manage the company's affairs, and to superintend the improvements which were to be made.

These improvements involved the expenditure of large sums of money, and in the summer of 1891, being unable to respond to the demands made upon him by Underwood, Venner peremptorily ordered that all work be at once suspended. Thereupon Underwood, as president, and Dennis Sullivan and several other directors, sent in their resignations, which were presented to the board of directors at a meeting held in New York City, on July 27, 1891. The resignation of Underwood was accepted, but no action was taken upon the resignations of the others.

On February 2, 1892, Dexter and McPhee instituted an action in this court to foreclose the mortgage which had been executed by The Domestic Water Company to secure one set of the underlying bonds. Service in this proceeding, which was numbered 16249 on the register of actions, was made upon The American Water Works Company by delivering a copy of the summons to Dennis Sullivan. On the same day, Carlos S. Greeley, surviving trustee, instituted an action in this court to foreclose the mortgage which had been executed by The Denver City Water Company to secure the other set of underlying bonds. In this proceeding, which is numbered 16250, service was also made upon The American Water

Works Company by delivering a copy of the summons to Dennis Sullivan. In both cases, on application of the plaintiffs, Sullivan was appointed receiver of the company's property.

On April 2, 1892, Catherine Archer, as a stockholder of The American Water Works Company, filed her bill in the court of chancery of the state of New Jersey, in which, after stating all the negotiations and agreements which had led up to the formation of The American Water Works Company, and the purposes and objects of its organization, she charged that Venner and others confederating with him were fraudulently and unlawfully preventing certain persons from participating in the management of the affairs of the corporation who were entitled so to do, and prayed that the court would determine who were the stockholders of the company entitled to participate as such in stockholders' meetings, and that, after such determination, the court would order a meeting of the stockholders to be held for the purpose of electing officers. She also prayed that, pending such determination, the court would issue an injunction restraining Venner and his associates from holding corporate meetings, and from assuming to act as officers of the corporation, and from using the corporate name. About the same time, The Denver City Water Works Company, William A. Underwood and Catherine Archer, as stockholders of The American Water Works Company, and one of the creditors of said company, filed a bill in the same court, alleging the insolvency of the corporation, and praying for the appointment of a receiver, and for an injunction. In these cases such proceedings were had that, on July 22, 1892, by

a decree of the court, one E. Hyde Rust, was appointed receiver of the corporation, and an injunction was issued as prayed.

On May 19, 1892, the seven per cent bondholders organized for the protection of their common interests and appointed a committee, which will hereafter be referred to as "the seven per cent. committee."

On June 1, 1892, The Farmers' Loan & Trust Company instituted an action in this court to foreclose the mortgage which had been executed to it by The Denver Water Company. In this action service was made upon The American Water Works Company by delivering a copy of the summons to Dennis Sullivan; and on May 11, 1893, it was consolidated with the two foreclosure proceedings above referred to, under one title and under one number, namely, 16249.

On October 1, 1892, the Central Trust Company instituted an action in this court to foreclose the mortgage which had been executed to it by the Denver City Water Works Company. In this proceeding service was made upon the American Water Works Company by delivering a copy of the summons to Clarence H. Venner.

On July 20, 1893, in The Farmers' Loan & Trust Company proceeding, No. 16249, the court entered a decree of foreclosure, in the last paragraph of which it reserved the power to make such amendments as might be discovered to be necessary to protect the rights of the parties, and retained jurisdiction until the sale of the property therein provided for.

In that proceeding, the Central Trust Company had appeared and answered as a defendant, and had made a vigorous resistance to the enforcement of

the lien of the mortgage being foreclosed upon any after-acquired property. Feeling itself aggrieved by the result of the trial, on August 16, 1893, it sued out of the court of appeals a writ of error to review the decree. While the case was pending in the court of appeals, to-wit, on November 20, 1893, the five per cent. bondholders organized for the protection of their interests and appointed a committee, which will be hereafter referred to as "the five per cent. committee."

Negotiations at once commenced between the seven and five per cent. committees, for the settlement of their differences, and an agreement was reached on January 11, 1894. Immediately thereafter a joint committee, called "the reorganization committee," was appointed to represent both sets of bondholders, and negotiations were opened with The Citizens' Water Company for the purpose of effecting a consolidation between the property decreed to be sold and the property of that company. Before the foreclosure sales were made, these negotiations had resulted successfully, in the formation of a plan of consolidation which was satisfactory to all parties in interest.

As a result of the settlement of the differences between the seven and five per cent. committees, the writ of error in the court of appeals was dismissed on March 12, 1894, and the cause was remanded to this court. On March 29, 1894, in the exercise of the power which it had reserved, this court permitted an amendment to the decree, the effect of which was to subject the Mountain and Beaver Brook properties to the lien of the Farmers' Loan & Trust Company mortgage and to order the sale of the same.

The decree as thus amended was then entered as a final decree of the court. On the same day a final decree was entered in the Central Trust Company case, and under both decrees Dennis Sullivan was appointed commissioner to make the sales. Publication of notices of sale was made on March 31, 1894, and the sales were made on April 21, 1894. At both sales the property was struck off to William A. Underwood, representing the reorganization committee. On April 23, 1894, an order of court was entered, confirming the sales as reported by the commissioner.

Thereafter, to-wit, on October 18, 1894, pursuant to the plan of consolidation which had already been agreed upon between the reorganization committee and The Citizens' Water Company, The Denver Union Water Company was organized, to which was at once conveyed all the property of the Citizen's Water Company and all the property sold under the foreclosure decrees. From that time to the present, the Denver Union Water Company has been in the continuous possession of the consolidated property, claiming title thereto. On October 20, 1894, it executed and delivered to the Continental Trust Company, its co-defendant in this action, a mortgage on all of said consolidated property, to secure bonds to the amount of eight millions of dollars.

While these events were transpiring in this state, on April 13, 1893, The United Water Works Company (limited), as a stockholder of The American Water Works Company (of Illinois), filed a bill in the circuit court of the United States for the district of Nebraska, in which it alleged that the convey-

ance of the Omaha plant to the American Water
Works Company (of New Jersey) was illegal and
void, because the complainant, as a stockholder in
the said Illinois Company, had never consented to
said conveyance, and prayed that the consolidation
of The American Water Works Company (of Illinois)
with the Denver City Water Works Company of
Colorado be set aside as illegal and void, and that
the conveyance of the water works plant at Omaha
to the New Jersey company be set aside, and that The
American Water Works Company (of New Jersey)
and E. Hyde Rust as receiver of said company be
required to re-convey to the said Illinois company
the water works plant at Omaha, together with all
the franchises connected therewith. On July 3, of
the same year, The American Water Works Com-
pany (of Illinois) filed an answer in which it admit-
ted the illegality of the consolidation and of. the
conveyance of its plant to the New Jersey company;
and on August 19 it filed a cross-bill, in which it
also prayed that the said consolidation and convey-
ance be adjudged illegal, null and void, and be set
aside.

In this cause such proceedings were had that on
April 22, 1895, a final decree was entered, in which it
was adjudged that the conveyances executed by The
American Water Works Company (of Illinois) to
The American Water Works Company (of New Jer-
sey) were null and void, and that The American
Water Works Company (of New Jersey) acquired
no title to the property in said conveyances described.
It was further adjudged and decreed that the title
to all the property and franchises described in said
conveyances be revested in The American Water

Works Company (of Illinois), and that the decree itself should operate as a deed of reconveyance.

This is an original action in the nature of a bill of review, in which the plaintiffs, as stockholders of The American Water Works Company (of New Jersey), sue upon a cause of action which they allege exists in favor of their corporation. The specific relief which they seek is the annulment of the two decrees of foreclosure above referred to. As ancillary thereto, they pray for such other relief as they would in equity be entitled to upon said decrees being declared null and void.

E. Hyde Rust, the receiver originally appointed, filed an answer, in which he practically disclaimed any interest in the controversy, and submitted the whole matter to the judgment of the court. After his death, and after the issues in this case had been practically settled, a new receiver was appointed, who has filed a different answer, in which he virtually adopts the case as stated by the plaintiffs, and ranges himself by their side in this contest. Thereupon the defendants prayed and obtained leave from the court to file a cross-complaint against The American Water Works Company (of New Jersey) and the receiver, in which they seek to have the title of The Denver Union Water Company to the property in controversy quieted.

The case now comes on for decision on the pleadings and the proofs, as between the plaintiffs and defendants, and as between the cross-complainants and The American Water Works Company (of New Jersey) and the receiver thereof.

The grounds upon which the validity of the decrees is assailed are:

First: Failure of the court to acquire jurisdiction of the person of The American Water Works Company (of New Jersey).

Second: Failure of the court to acquire jurisdiction of a part of the subject matter involved.

Third: Error manifest upon the record.

Fourth: Attempted exercise of jurisdiction over The American Water Works Company and its property after the powers of that company had been abrogated.

Fifth: Fraud in procuring the decrees and in all subsequent proceedings.

The most interesting and the most important question presented by this record is that raised as to the sufficiency of the service of the process upon The American Water Works Company.

In The Farmers' Loan & Trust Company proceeding, No. 16249, service of process was made upon Dennis Sullivan, who is described in the sheriff's return as president of the company. In the Central Trust Company case, No. 17476, service was made upon Clarence H. Venner, who is described in the sheriff's return as vice-president of the company.

Paragraph 260 of the general statutes reads as follows:

"Foreign corporations shall, before they are authorized or permitted to do any business in this state, make and file a certificate signed by the president and secretary of such corporation duly acknowledged with the secretary of state, and in the office of the recorder of deeds of the county in which such business is carried on, designating the principal

place where the business of such corporation shall be carried on in this state, and an authorized agent or agents in this state residing at its principal place of business upon whom process may be served; and such corporations shall be subjected to all the liabili- ties, restrictions and duties which are or may be im- posed upon corporations of like character organized under the general laws of this state, and shall have no other or greater powers."

The ninth subdivision of section 38 of the Civil Code, as amended by the act of 1891, provides: "If the action be against a foreign corporation, or joint stock company or association, organized under the laws of another state or territory, and doing busi- ness within this state, the summons shall be served by delivering a copy to *any agent* of such corporation, company or association found in the county in which the action is brought. If no such agent be found in such county, then by delivering a copy of the sum- mons to any stockholder who may be found in such county."

Under these provisions, it is contended by counsel for plaintiffs that the service above described upon The American Water Works Company was wholly insufficient to confer jurisdiction upon the court, since it appears that said company had designated an agent for the service of process; and in this contention they are sustained by the case of Venner v. The Denver Union Water Company, decided by the court of appeals of this state, and reported in 3 Colo. Dec. 11.

In that case, the validity of the two decrees, which form the subject of inquiry in this case, was directly involved; and it was held by the court, as to case No. 17476, that the service upon Clarence H. Ven-

ner, as vice-president, was insufficient to confer juris-
diction, and that the decree in said case was there-
fore void.

It is strenuously insisted by counsel for plaintiffs
that this decision is binding upon this court, and is
conclusive of the question here presented.

This contention, it seems to me, is answered by
the case of Calhoun G. M. Co. v. Ajax G. M. Co., 27
Colo. 1, in which the supreme court overruled its own
decision in the case of Branagan v. Dulaney, 8 Colo.
408, upon the construction of an act of congress.
Speaking for the court, Mr. Justice Gabbert said:
"The doctrine of *stare decisis* is based upon the as-
sumption that the rules of law to which this doctrine
applies have previously been determined by a court
having final jurisdiction of the questions involved.
For this reason, where the decision of a tribunal is
subject to review by one having superior authority
over it for that purpose, or the question determined
may be passed upon by such tribunal in another
case, the doctrine of *stare decisis* does not apply with
full force until the same questions have been deter-
mined by the court of last resort. The construction
of an act of congress cannot be said to be authorita-
tively settled until passed upon by the highest court
authorized so to do. This is the supreme court of
the United States. It has never decided the question
regarding cross veins as presented in the case at bar.
The decision of this court on that question may be
reviewed by that tribunal; so that, although this
court has given the statutes affecting cross veins a
construction which has since been followed in this
state, nevertheless, as the same statutes are still open
to construction by the highest tribunal of the land,

their meaning on the subject of cross leads, as involved in this case has not been finally determined so as to become *stare decisis.*"

If it be conceded that the legislature can constitutionally create a court whose judgments shall be final and conclusive as to the rights of the parties brought before it, nevertheless, every question of law which can possibly arise in any court in this state must ultimately be determined by the supreme court. From the decision quoted, then, it necessarily follows that no proposition of law can be said to be authoritatively settled until it has been declared by that court. And to my mind it is utterly incomprehensible that *nisi prius* courts can be bound in conscience by any decisions which are not authoritative.

This conclusion carries with it nothing derogatory to the dignity of the learned court, which has uniformly commanded the admiration and respect of the bench and bar, because of its invaluable services to the state, and because of the ability and learning of the various judges who have ornamented its bench. It is the inevitable result of the fundamental principle which distinguishes the law, as an applied practical science, from mere speculative philosophy. To secure certainty and uniformity in any system administered by numerous co-ordinate agencies, there must be a central authority of arbitrary finality. This is the tribute which practical common sense must pay to the finiteness of the human understanding. Every judicial system, therefore, recognizes that it is essential to establish a final tribunal, clothed with legal infallibility, in the sense that it speaks authoritatively and ultimately. Every question submitted for its consideration and determina-

tion is resolved into the settled law. The law which it announces appeals, not to the reason, but to the conscience. It is not to be followed, but to be implicitly obeyed; and its binding effect upon all other tribunals under the same sovereignty does not flow from the fact that it may carry with it the conviction of inherent rightness, but from the fact that the sovereign power has arbitrarily declared that it shall be the end of all discussion upon the subject involved.

It is further self-evident that under each sovereignty there can be one, and but one, such tribunal; for otherwise the possibility and probability of conflict and doubt cannot be excluded, and that exclusion is the object and end of every judicial system. Under the constitution of this state that tribunal is the supreme court—"Supreme in the majesty of its duty, supreme in the majesty of its power." It alone speaks *ex cathedra*, and to its decisions alone does the doctrine of *stare decisis* apply.

If the legislature can constitutionally make the judgments of the court of appeals final and conclusive in any particular class of cases, then undoubtedly the decision which it may render in any such case will continue to be the law of that particular case unto the end. But when its decisions are invoked as precedents in other cases, they are, in my opinion, persuasive only, and not binding; because they are not the authoritative enunciation of principle of law made by that court which alone is by the constitution vested with the absolute and indivisible power of finally determining all legal questions. Undoubtedly they are and should be received with the highest degree of respect and consideration, and

undoubtedly they should be followed by the judge of every inferior court unless, after the fullest investigation, he is convinced beyond every reasonable doubt that a mistake has in some manner been committed. The question is certainly one of the greatest embarrassment to this court, and the only relief that comes with it is the hope that its consideration in a case of this magnitude may contribute in some degree toward securing from the supreme court a precise definition of the status of the court of appeals in the judicial system of the state, and of the duty of the *nisi prius* courts in relation to its decisions.

In the opinion in the case relied upon, the entire argument of the court upon the question of service is devoted to showing why the service made upon Clarence H. Venner was not a sufficient and legal service upon him as a stockholder. The question of its sufficiency upon him as vice-president receives but scant consideration in the opinion. Indeed, the court contents itself with saying: "But under no condition would service upon a vice-president of a foreign corporation satisfy the requirements of the statute."

It is from this side that I propose to consider the question, and with the aid of precedents drawn from other jurisdictions, I will endeavor to show why I am convinced that the question is controlled by the decisions of our own supreme court.

In the first place, it is settled that a foreign corporation may do business in this state within the meaning of § 38 of the civil code and be liable to suit in our courts, although it has not complied with the statute, and has not designated an agent upon whom process may be served; and that said § 38 fur-

nishes a method of obtaining service upon such corporation. Colo. Iron Works v. Sierra G. M. Co., 15 Colo 499.

It is certain, then, that the phrase "any agent," as used in the code provision, does not refer to and mean exclusively the designated agent of the statutory provision; because under such construction the right of our citizens to redress in their own courts their grievances against a foreign corporation which has not complied with the statute could not be exercised unless, perchance, a stockholder could be found upon whom process might be served although scores of agents of such corporations might be actually within our jurisdiction, upon any one of whom process could be served without violating any principle of natural justice.

As said by the supreme court of the United States in a similar case: "It is incredible that the legislature should have intended to have limited its own citizens to such an insufficient remedy when the corporation is actually doing business in the state [territory], and is represented there by a manager or local agent." Henrietta Mining & Milling Co. v. Johnson, 173 U. S. 221.

In the second place, it can never be presumed that any system or rule of practice or procedure relating to any particular subject is intended to be exclusive, unless it is sufficient to meet every contingency which common experience may suggest as likely to arise. Paragraph 260 of the general statutes makes no provision whatever for the service of process upon foreign corporations complying therewith, in case the designated agent should die, resign, remove from the state or be temporarily absent

therefrom. If the method of service therein provided for be held to be exclusive it follows that in case of the death, resignation, removal or temporary absence of the designated agent, service of process could not be made upon such corporation during the continuance of the vacancy thus created, and the duration of the vacancy would depend upon the pleasure of the corporation. Moreover, it is perfectly apparent that a foreign corporation, upon complying with the statute, could easily prevent itself from being subjected to litigation in our courts by designating a complaisant agent, who could always be conveniently absent when wanted.

That the legislature intended a method of service so manifestly incomplete and insufficient to be exclusive is not to be believed; and this is virtually conceded to be true in the opinion of the court of appeals. The entire reasoning in that opinion upon the question of service is devoted to showing why the sheriff's return did not show a valid service upon Venner as a stockholder. If valid service could not have been made upon him as a stockholder, there would have been no necessity for such reasoning. It would have been sufficient to simply declare that paragraph 260 of the general statutes furnishes an exclusive method of service upon foreign corporations which have complied therewith, and that § 38 of the civil code has no application to such corporations. The making of the argument is of itself an implied admission that under some circumstances valid service can be made upon the stockholder of a foreign corporation, although an agent nas been designated upon whom service of process may be made. Furthermore, the court expressly says:.

"There could be no service upon a stockholder except upon a failure to find an agent in the county."

It necessarily follows from the decision, therefore, that the two provisions relating to the service of process upon foreign corporations must be read together, and the most that can be claimed under the case is that paragraph 260 of the general statutes furnishes, not an exclusive, but a preferred method of service; that is to say in actions against a foreign corporation which has complied with the statute and has designated an agent upon whom process may be served, service must be made upon such designated agent if it can be done; but if, with the exercise of due diligence such agent cannot be found, then service may be made upon such foreign corporation under the ninth subdivision of section 38 of the Civil Code; provided, that in no event will service upon such corporation under said provision of the Civil Code be valid unless the officer's return affirmatively excuses the failure to make service upon the designated agent.

I know of no rules of construction by which this result can be spelled from the letter of the two provisions. Read apart, or read together, there is not a word or a line in either or both from which such a meaning can be gathered. And I can conceive of no reason for even assuming such to have been the intention of the legislature, unless we boldly declare that the purpose of paragraph 260 of the general statutes was to confer upon foreign corporations, as a reward for their compliance therewith, the right to the specific mode of service therein provided for; that such right is in its nature contractual; and that, therefore, all contemporaneous and subsequent legis-

lation touching the matter must be construed as tend-
ing to recognize and conserve that right. In my
judgment, this position cannot be assumed without
doing violence to settled principles.

Section 38 of the Civil Code was enacted in 1891.
It is framed in the most general and comprehensive
terms. It applies to all foreign corporations without
exception; and there can be no doubt that it includes
within its meaning all such corporations, whether
they have or have not complied with the statutory
provision. The phrase "any agent" is employed
therein without any qualification or limitation; and
there can be no doubt that it includes, not only des-
ignated agents, but all persons who are sufficiently
representative of such corporations for the purpose
of the service of process. As a statutory enactment
it is complete and perfect in form and structure; and
its language is clear, plain, unequivocal and unam-
biguous. There is, therefore, no room for construc-
tion, and the sole question is, will the courts enforce
it as an expression of the legislative will, according
to its plain meaning, or will they render it nugatory
by distorting its meaning to meet the supposed policy
of an earlier statute?

Not only is it the latest expression of the legisla-
tive will, but it carries with it a repealing clause.
Section 3 of the act of 1891 provides: "All acts or
parts of acts inconsistent with the provisions of this
act are hereby repealed." (Session Laws, 1891, p.
81.) This repealing clause is not an idle form; it is
a solemn declaration by the only law-making power
that its will as expressed in the plain terms of the
act shall, and shall alone, be the law; and that any-
thing inconsistent therewith, to be found in any and

all prior acts, shall be repealed. If, therefore, anything can be found in paragraph 260 of the general statutes, either expressly stated or to be deduced by construction, which is inconsistent with section 38 of the code, giving it its full significance, then the meaning of section 38 cannot be pared down to meet the requirement of paragraph 260; on the contrary, so much of the latter section as raises the inconsistency must unquestionably be deemed to have been repealed by the act of 1891.

But there is no inconsistency between the two provisions; they can both well stand together, and each can be given the full significance which its language imports without doing violence to the language of the other. An inconsistancy can be raised only by assuming that the intent of paragraph 260 of the general statutes was to confer upon foreign corporations the right to the specific mode of service therein provided for. This assumption is warranted neither by the language of the paragraph nor its general purpose. The words employed are not mandatory, but permissive. It does not require foreign corporations to designate agents upon whom process shall be served, but "upon whom process may be served." It is true that permissive words in a statute are sometimes given a mandatory effect, but never in a case of this character. The rule is well settled that "Such words when used in a statute will be construed as mandatory for the purpose of sustaining and enforcing rights, but not for the purpose of creating the right or determining its character." Sutherland, Stat. Constr., § 462.

There is no principle of law under which a foreign corporation is entitled to any specific mode of

service of process. On the contrary, it is settled as definitely as any proposition can be, that whenever a corporation leaves the state of its organization and enters another state to transact its business, it impliedly consents to be subject not only to such laws relative to the service of process as may at the time be in force in such state, but to all subsequent laws which may there be enacted while it continues within its jurisdiction. And it is further definitely settled that a judgment rendered in any state against a foreign corporation doing business therein upon any service of process authorized by the statutes of that state will be recognized as a valid judgment by the courts of all other states and by the federal courts, provided, the method of service authorized and used does not violate the principles of natural justice. The permissive words, therefore, employed in paragraph 260 of the general statutes cannot be held to create for foreign corporations the right claimed for them by plaintiff's counsel.

Moreover, it is most important to remember that the statute under consideration is in no sense a practice act, nor does it pretend to describe the method or mode of service of process upon foreign corporations. It is a statute designed solely to prescribe the terms and conditions upon which such corporations may be permitted to do business in this state. Those terms and conditions are imposed, not for the benefit of the corporations, but for the protection of our own citizens. When, therefore, as one of the conditions it is required that such corporations shall designate agents upon whom process may be served, that requirement is for the benefit of our citizens; it is remedial in its nature, and must be liberally construed

so as to advance the remedy; not narrowly, so as to restrict and limit it; or, as it is put in some of the cases, such provisions must be considered as provisions of enlargement, and not of limitation and restriction.

That the legislature, in framing, for the benefit of our own citizens, the terms and conditions upon which foreign corporations may be permitted to do business throughout the entire state, and with our citizens, imposed as one of the conditions that such corporations shall designate agents upon whom process may be served, and intended that in all actions brought by our citizens against such a corporation service must be made upon its designated agent if he could be found, is to my mind too preposterous to be believed; because such a provision would place foreign at a great advantage over domestic corporations, and instead of being a benefit to our citizens, it would be an unreasonable and unnecessary source ef great inconvenience.

On the other hand, since a foreign corporation, after incurring liabilities, might withdraw its agents from the state, or might transact its business through agents only occasionally within our jurisdiction, or through persons whose agency at the time of service might be readily disputed, it was right and proper for the protection of our citizens that the legislature should provide for the presence within our jurisdiction of at least one representative of each foreign corporation doing business here, upon whom service of process can be made with certainty, if not with convenience, when service cannot be made in any of the other methods provided by law. All of the authorities agree that it is for this purpose, and for this

purpose alone, that such provisions are enacted, when cast in the permissive form.

Another consideration presents itself, drawn from the history of the two provisions. The statutory provision relative to the designation of agents by foreign corporations appears *verbatim* in the general laws of 1877, and there can be no doubt that it has the same meaning to-day that it had when first enacted. Section 37 of the code of 1877 read: "A summons shall be served, *except as otherwise provided by law*, as follows: * * * If the suit be against a foreign corporation, or a non-resident joint stock company or association, doing business within this state, service shall be made by delivering a copy of the writ to an agent, cashier or secretary thereof; in the absence of such agent, cashier, treasurer or secretary, to any stockholder." This provision was re-enacted *verbatim* in the code of 1887, and appears as section 38. In 1891, section 38 of the code of 1887 was amended to read as above quoted. In passing, it is well to note that the words "except as otherwise provided by law," appearing in the codes of 1877 and 1887, are omitted in the statute of 1891.

At first blush the provision in the code of 1877 and of 1887 appears crude and awkward, but a close analysis of its terms and their arrangement shows it to be full of significance. The first point to be noticed is that the word "agent" is preceded by no descriptive adjective, but simply by the indefinite article "an." In statutes relating to the service of process upon corporations, where the word "agent" is associated with the titles of officers of corporations, it is uniformly preceded by some qualifying adjective, descriptive of the particular agent upon whom service

may be had; the adjective commonly used being "general" or "managing." The omission of the adjective in this case makes the sentence tautological. A cashier is an agent; a secretary is an agent. When, therefore, the legislature said an "agent, cashier or secretary," it said no more than if it had simply used the word "agent." The insertion of the words "cashier" and "secretary," therefore, makes it clear that the legislature must have had in mind some particular kind of agent. The second point to be observed is that in such statutes the titles of the officers of corporations are uniformly placed in the order of their importance, that of president standing first, that of agent, however qualified, standing last. In the code provision now under consideration the term "agent" is given the place of precedence, and stands in the position uniformly held by the term "president."

The term "agent" was not given the place of precedence either by accident or inadvertence. The code provision was enacted shortly after the enactment of the statutory provision relative to the designation of agents by foreign corporations. The legislature proceeded upon the proper presumption that all foreign corporations proposing to do business in this state would comply with the requirements of the statute; as it intended they should, and in framing the code provision for the service of process upon foreign corporations, it had in mind the compliance by them with the statutory provision. The term "agent" was therefore given the place of precedence intentionally, because the legislature had in mind the designated agent, who, for the purpose of service of process, would stand to a foreign corporation precisely as the presi-

dent of a domestic corporation does to his company. For the same reason the terms "cashier" and "secretary" were inserted in the provision. It was naturally supposed that a foreign corporation complying with the statute would establish offices in this state, and that such offices would be placed in charge of officers bearing these titles.

I do not mean to say that the code provision of 1877 was intended to apply exclusively to foreign corporations which might comply with the statute, but I do mean to say that in framing it the legislature clearly had in mind such foreign corporations, and that the form in which the provision was cast was determined by that fact.

It is well settled that if the titles of several officers be enumerated in a statute providing for the service of process upon corporations, service upon either one named in the list is sufficient, and it is not necessary that the return should negative the ability of the officer making the service to find those whose titles precede that of the one served. Comet Consolidated Min. Co. v. Frost, 15 Colo. 310. There can be no doubt, then, that under the code of 1877 or the code of 1887 service upon a foreign corporation could be made by delivering a copy of the summons to either the secretary or cashier thereof, and that it would not be necessary for the return to negative the ability of the officer to find the designated agent. If this be true, then it is demonstrated that the statutory provision under consideration, which was in full force while those code provisions were in force, does not provide even a preferred mode of service; because under those provisions the party bringing suit against a foreign corporation had his option to procure

service either upon a designated agent, a cashier or a secretary thereof.

The conditions in this state in 1891 were far different from those existing in 1877. In the marvelous development of our resources and industries, no inconsiderable part had been played by foreign corporations. Railway, telegraph, electric, mining, insurance, financial, manufacturing and commercial companies, organized under the laws of other states, had crossed our borders in great numbers; some complying with the law, and others refusing so to do. Their agents had penetrated into every county in the state, and were daily transacting business with our citizens, upon which at any time causes of action might arise in any county in the state.

The reports of the decisions of the last fifteen years are full of declarations to the effect that it is just and right that the legislature of each state should protect its citizens in their dealings with foreign corporations; and that it is its duty, in order to secure such protection, to make such reasonable provision for the service of process as will enable its citizens to redress their grievances against such corporations in their own forums and at their own doors. The power of the legislature so to do has been repeatedly affirmed by the supreme court of the United States.

The legislature of 1891 fully realized the condition and its duty in the premises. It realized that a foreign corporation, no matter where its principal office may be located, ought to be subject to suit in any county in the state in which a cause of action against it may arise, just as our own citizens and our domestic corporations are. It further realized that to pro-

mote convenience, service upon such corporations should be permitted to be made in any county where a representative of it can be found; and it further realized that any agent of a foreign corporation, who is sufficiently representative of his company to transact business with the citizens of our state, is sufficiently representative of it for the purpose of the service of process in litigation arising upon that business. It, therefore, swept away the cumbersome provision of the code of 1877, and declared in unequivocal terms, as to all foreign corporations, whether they have complied with the statute or not, that service can be made upon any agent, whether designated or not, in any county of the state in which such agent may be found.

In his great work on the law of corporations, Thompson states the rule as follows: "Statutes relating to service of process on corporations being in general exclusive, when the law of the domestic state requires the foreign corporation, as a condition of doing business in the state, to appoint an agent within the domestic state and empower him to receive service of process in actions against it, and lodge evidence of such appointment with the secretary or other officer of the state, then, unless the statute is in its language *permissive* [author's italics], so as to admit ot other modes of service, service must be had upon that officer alone, or there will be no jurisdiction of an action against the corporation." 6 Thompson Com. Law Corp., § 8025.

In the case of The Connecticut Mutual Life Insurance Company v. Spratley, 99 Tenn. 322; s. c., 42 S. W 145, the material facts were as follows: Section 12, chapter 66, of the acts of 1875

of the state of Tennessee, provided that any foreign
insurance company desiring to transact business by
any agent or agents in that state should file with
the insurance commissioner a power of attorney
authorizing the secretary of state to acknowledge
service of process for and in behalf of such company
at any and all times after the company had first com-
plied with the laws of the state, and had been regu-
larly admitted, even though such company might sub-
sequently retire from the state or be excluded there-
from.    In 1887 the legislature of Tennessee passed
an act entitled "An act· to subject foreign corpora-
tions to suits in this state," in the third section of
which it was provided that process might be served
upon any agent of such corporation found within the
county where the suit is brought, no matter what
character of agent such person may be.    The Con-
necticut Mutual  Life Insurance Company was a for-
eign corporation which began to do an insurance
business in the state of Tennessee in the year 1870,
and which duly complied with the act of 1875 and
filed the power of attorney required thereby, which
continued unrevoked and in full force during all the
time of the proceedings.    In 1889 and in 1893 it
issued policies on the life of one Benjamin R.
Spratley.    In 1894 the company ceased to issue any
new policies in the state of Tennessee and withdrew
its agents from the state, and notified the state in-
surance commissioner to that effect.    In February,
1896, Benjamin R. Spratley died.    The two policies
were in force at the time of his death.    The company
being notified of his death, sent an agent to Tennes-
see to investigate and adjust the claim.    While the
negotiations were in progress, to-wit, in April, 1896,

Mrs. Spratley, the beneficiary named in the policies, instituted an action thereon in the state court, in the county in which she resided, and caused service of process to be made upon the agent with whom she was negotiating. The insurance company ignored the action, and judgment was taken in her favor by default. Thereafter the insurance company applied to the court of chancery for an injunction to restrain the enforcement of the judgment, upon the ground that the same was void for want of valid service of process. A permanent injunction was granted by the chancellor, and from his decree an appeal was taken to the supreme court of the state. Two contentions were made on behalf of the company: first, that the act of 1895 provided an exclusive mode of service upon insurance companies complying therewith, and the appellee having complied therewith was not amenable to service under the act of 1887; second, that the compliance by the appellee with the act of 1875 created for it a contractual right to the specific mode of service therein provided, which under the federal constitution could not be impaired by the subsequent act of the legislature. The supreme court reversed the decree of the chancellor, and held the service made under the act of 1887 to be valid and sufficient. In so doing it said: "But we concede that the power of attorney given by the complainant is irrevocable, and stands to-day as if the act of 1875 still existed; yet it does not follow that the service on Chaffee, as agent, in the circuit court, was ineffectual to bring complainant into that court. The continued existence of the power of attorney does not preclude the complainant from being amenable to the operation of the act of 1887. The

secretary of state was not the agent of this corpora-
tion, save in the most restricted sense; and he was
located at the capital of the state, where the dis-
charge of his official duties properly placed him.
We may concede that Mrs. Spratley might have
called upon him to accept service of her process; but,
instituting her suit as she did, at her own home, in a
remote part of the state, where there was no resident
agent of the complainant, but finding one there tem-
porarily whose agency embraced the very subject of
her controversy, she had a case within the purview,
and was entitled to avail herself, of the act of 1887.
As this court said in Telephone Co. v. Turner, *supra*,
this act was not one of 'limitation' but of 'en-
largement'; and we are unable to discover why it
should not be operative against complainant, while
at the same time its power of attorney remains irre-
vocable.   But we cannot accede to the proposition
that by complying with the act of 1875, by the exe-
cution of its power of attorney to the secretary of
state, that complainant thereby made a contract with
the state of Tennessee which is protected by the
contract provision of the constitution of the United
States, and that no subsequent legislation can make
this corporation amenable to action in the courts of
this state by service of process on any other agent.
We are unable to discover any element of a contract
which precluded the state from thereafter adopting
legislation which contemplated bringing this corpora-
tion into our courts by service on such other agents
as reasonably represented it and were found carrying
on its business within our territorial limits.   *   *   *
We deem the act of 1875 in this regard as simply im-
posing a condition for the state's permission to a

foreign life insurance company to come within its borders and transact business with its citizens, and there was nothing in it or in the acceptance of its terms by the complainant, precluding the legislature from thereafter making other provisions by which, through service upon other agents either permanently residing or temporarily found here, this corporation might be made to answer in our courts for breach of its contracts made here."

This case was subsequently carried to the supreme court of the United States upon the federal question involved, and the judgment of the supreme court of Tennessee was affirmed in an able and instructive opinion by Mr. Justice Peckham, which concludes as follows: "When the legislature of Tennessee, therefore, permitted the company to do business within its state on appointing an agent therein upon whom service of process might be served, and when, in pursuance of such provisions, the company entered the state and appointed the agent, no contract was thereby created which would prevent the state from thereafter passing another statute in regard to the service of process, and making such statute applicable to a company already doing business in the state. In other words, no contract was created by the fact that the company availed itself of the permission to do business within the state under the provisions of the act of 1875.

"Upon the case presented in this record, we are of the opinion that the service upon the person in question was a good service in behalf of the corporation."

The same statutes of Tennessee were construed by the United States circuit court of appeals of the

sixth circuit in the case of Mutual Reserve Fund Life Ass'n v. Cleveland Woolen Mills, 82 Fed. 508. A proceeding in chancery had been instituted in the state chancery court of Bradley county concerning a policy which had been issued to one John H. Parker. This proceeding was subsequently removed to the circuit court of the United States for the eastern district of Tennessee. The material facts are stated in the opinion of the court, so much of which as bears upon the question of service reads as follows: "The process by which the appellant association was brought into court was served upon the local agent representing the association at Cleveland, Tennessee. The association also pleaded in abatement that it was a corporation of another state, doing business in Tennessee in accordance with chapter 66 of the Tennessee acts of 1875, and that by section 12 of that act all such companies were required to file with the insurance commissioner of the state a power of attorney, authorizing the secretary of state to acknowledge service of process for and in behalf of such companies in suits brought in the courts of the state. The contention of appellant is that as it had complied with this law, no process could be lawfully served upon its agents or officers, and this suit could only be brought by process served on the secretary of state. This section has not been construed by the supreme court of Tennessee. By sections 3516 and 3539, Rev. Code Tenn., general provision is made for the service of process upon the resident agents of corporations in all actions growing out of the business of the corporation. Though foreign corporations are not specifically mentioned in these sections, yet they have

been construed as conferring the right to commence a suit against a foreign corporation doing business within the state, by service of process on any agent resident in the county where suit was brought. By the third section of chapter 266, Tenn. acts of 1887, it was provided that process might be served "upon any agent" of a foreign corporation found within the county where the suit was brought. This act was construed as intending to enlarge, and not limit, the jurisdiction over such companies. We think a like construction should be given to section 12 of chapter 66 of the acts of 1875. It was not the purpose of that provision to prevent such corporations from being served with process in the ordinary way where they have a resident agent, but to provide an additional mode of obtaining jurisdiction, which might be available if such company had no resident agent. The plea in abatement was properly overruled."

In Henrietta Mining and Milling Co. v. Johnson, *supra*, the material facts were as follows: Section 348 of the revised statutes of Arizona is substantially the same as paragraph 260 of our general statutes, in requiring foreign corporations proposing to do business in that territory to designate an agent upon whom process may be served. Section 704 of the code of civil procedure of that territory provides: "In suits against an incorporated company or joint stock association, the summons may be served on the president, secretary or treasurer of such company or association, or upon the local agent representing such company or association in the county in which the suit is brought, etc." Section 712 of the same code provides: "When it is made to appear by affidavit

that the defendant is a corporation incorporated under the laws of another state or territory or foreign country, and doing business in this territory, or having property therein, but having no legally appointed or constituted agent in this territory, the clerk shall issue the summons and the sheriff shall serve the same by making publication thereof in some newspaper," etc. Section 713 of the same code provid s: "When the residence of the defendant is known, the plaintiff, his agent or attorney, shall forthwith deposit a copy of the summons and complaint in the postoffice, postage prepaid, directed to the defendant at his place of residence." In an action against a foreign corporation which had not designated an agent in compliance with section 348 of the revised statutes, service was made upon its general manager under section 704 of the civil code, and a judgment by default obtained. In this case it will be observed that not only was a special provision made for service of process upon foreign corporations complying with the statute, but also a special provision for service upon foreign corporations which should fail to designate an agent. It will also be observed that there was no express general provision for service upon foreign corporations. The supreme court of Arizona, upon appeal, held that the special provisions for service made by section 348 of the revised statutes, and by sections 712 and 713 of the civil code, were not exclusive, and that service had been properly made under section 704 of the civil code, which was broad enough in its language to include both domestic and foreign corporations. An appeal was taken from the judgment of the supreme court of Arizona to. the supreme court of the United States, and in

affirming the judgment of the court below, Mr. Justice Brown, speaking for the court, said: "It is insisted by the plaintiff in error that the service in this case upon its manager was ineffectual to bind the corporation, and that a personal judgment under it could only be obtained by complying with section 348, and serving upon agent appointed in pursuance of that section; and that this position holds good notwithstanding such appointment had never been made. We are of the opinion, however, that sections 348, 712 and 713, providing specially for service upon foreign corporations, were not intended to be exclusive, and were merely designed to secure a special mode of service in case the corporation had ceased to do business in the territory, or had no local or official agent appointed in pursuance of section 348. Not only is the language of section 348 permissive in the use of the words 'may be served' upon the agent appointed under the statute, but the general language of section 704, taken in connection with the general subject of the statute, 'process and returns,' indicates that no restriction was intended to domestic corporations; and that the words 'any incorporated company or joint stock association' are as applicable to foreign as to domestic companies."

In Jones v. Ins. Co., 88 N. C. 499, the defendant was a foreign insurance company doing business in the state of North Carolina, and had complied with the statute passed in 1877, requiring foreign insurance companies to designate general agents upon whom process might be served. The suit was brought upon a policy issued by the company, and service was had on a local agent, under a statute passed in 1875 authorizing the service of process upon

such agents of foreign corporations. It was contended there, as here, that the company having complied with the statute relating to foreign corporations, the mode of service therein provided for was exclusive. Speaking of the act of 1875, which applied to foreign corporations generally, and the act of 1877 requiring the designation of agents by insurance companies, the court say: "The two acts are *in pari materia* and may well stand together and must be construed together. The conclusion is, that in actions against a foreign corporation, the summons may be served either upon a local or general agent. And we cannot suppose it was the intention of the legislature in passing the act of 1877, to restrict any advantages our citizens possessed against foreign corporations. We have no doubt the provisions of the act in regard to the appointment of a general agent, upon whom process might be served, was adopted in view of the fact foreign corporations sometimes did business in this state, without a resident agent, when there would be no one upon whom process could be served; in such case, our citizens would be driven to a foreign forum for the redress of their grievance, or that it might often occur that it would be doubtful whether a person was the agent, or whether his agency had not been revoked before the commencement of the action. By the act of 1877 a person is designated upon whom process may be served with certainty, but a policy holder may still, if he shall choose to take the risk that the person upon whom his summons is served is the local agent of the company, serve it upon him, and it will be as good as if served upon the general agent."

This case is much stronger than the case at bar, for

the reason that the statute requiring the company to designate an agent was the later expression of the legislative will.

In the case of Eagle Life Ass'n v. Redden, 25 So. 779, the action was against a foreign insurance company. Section 3274 of the code of Alabama provides: "When the suit is against the corporation, the summ ans may be executed by the delivery of a copy of the summons and complaint to the president or other head thereof, secretary, cashier, station agent or any other agent thereof." Construing this provision, the supreme court of that state says: "There is nothing in this statute which excludes foreign corporations from its provisions, and by its terms foreign as well as domestic corporations are included. It is true, other sections of the code make special provisions for service on corporations doing business in this state, when they are sued, but these several provisions are cumulative, for the greater convenience of those who desire to institute legal proceedings against such corporations. To hold otherwise, would be by judicial construction to render nugatory said section 3274 of the code which we have quoted above."

A statute of South Carolina, passed in 1887, relative' to the service of process upon corporations, provides that service can be made in respect to a foreign corporation only when it has property within the state, or the cause of action arose therein, or when such service shall be made in the state upon the president or any resident agent thereof. A statute passed in 1893 provides that foreign corporations carrying on business in the state shall file in the office of the secretary of state a declaration desig-

nating some place within the state at which legal papers may be served on said corporation.

In the case of Littlejohn v. Southern Ry. Co., 22 S. E. 761, it was held by the supreme court of South Carolina, under these two statutes, that service within the state upon a resident agent of a foreign corporation owning property in the state, at a place other than that designated in the declaration filed in the office of the secretary of state, in a cause of action arising in this state was valid. It was there contended, as here, that the foreign corporation having complied with the statute, the mode of service therein provided was exclusive. In the opinion the court thus disposes of the contention: "Next, as to the act of 1893, the title of which is as follows: 'An act to declare the terms on which foreign corporations may carry on business and own property within the state of South Carolina,' it does not purport to be an act designating the mode by which a foreign corporation may be made a party to an action brought in the courts of this state. On the contrary, its whole scope and object, as its title declares, are to prescribe the terms upon which a foreign corporation may carry on business in this state; and throughout its eight sections the only allusion made to the service of process upon the corporation is in the second section, which provides, as one of the terms upon which it is permitted to do business in this state, that it shall file in the office of the secretary of state within a prescribed time a declaration designating some place within this state as its principle place of business, 'at which all legal papers may (not "must") be served on said corporation,' which was doubtless intended to prevent just such a controversy

as had then recently arisen in the case of Hester v. Fertilizer Co., 33 S. C. 609. At least, there is not a word in the act which indicates a purpose to declare that the mode of service there permitted shall be the only mode by which a foreign corporation can be served." See also, from same jurisdiction, Pollock v. Carolina Inter-State Building Assn., 25 S. E. 977.

Section 432 of the civil code of New York provides that personal service of summons upon a foreign corporation must be made by delivering a copy thereof within the state, first, to the president, treasurer or secretary, or if the corporation lacks either of those officers, to the officer performing corresponding functions under any other name; second, to an officer designated for the purpose by a writing under the seal of the corporation and the signature of the president or vice-president, or other acting head, accompanied with the written consent of the officer designated, and filed in the office of the secretary of state; third, if such a designation is not in force, and neither the officer designated or any other person specified in subdivision 1 of the section can be found with due diligence, and the corporation has property within the state, or the cause of action arose therein, to a director or managing agent of the corporation within the state. A statute of the state enacted in 1884 provides that foreign insurance companies doing business within the state shall be required to file in the office of the superintendent of insurance of the state a written appointment of the superintendent as its attorney upon whom process in any action or proceeding against the corporation may be served. It will be observed that the code

provision applies generally to all foreign corporations, and that the act of 1884 applies to one particular class, namely, foreign insurance companies.

In the case of Howard v. Prudential Insurance Co., 37 N. Y. Sup. 832, an appeal was taken from an order denying a motion to set aside a service of summons. The defendant was a foreign insurance company, and the service complained of was made upon a managing agent in pursuance of the provision of the third subdivision of section 432 of the civil code. It had never designated an agent in accordance with the second subdivision of said section, which applies to all foreign corporations; but it had complied with the act of 1884 by filing in the office of the superintendent of insurance the written appointment of the superintendent as its attorney, upon whom process in any action or proceeding might be served. By reason of its compliance with the act of 1884 it was contended on its behalf that it was not amenable to service of process under the third subdivision of said section 432 of the code. Disposing of this contention, the court said: "The provisions of the code are general. No exception is made as to insurance companies. The provision of the act of 1884 appears in substance in section 30 of the insurance law (Chap. 690, Laws 1892), which is the present law on the subject. It provides a method in which such corporation 'may be served,' but does not exclude any other legal method of service. * * * We are of the opinion that the plaintiff was entitled to the benefit of the provision of the code, and that the order should be affirmed."

To the same effect see Silver v. Western Assurance Co., of Toronto, Canada, 38 N. Y. Sup., 335,

where, discussing the effect of the act requiring the designation of the insurance commissioner as attorney, it is said: "The provisions of the acts of 1884 and 1892 in no manner conflict with the provisions of the code. The acts of 1884 and 1892 provided for the service of process upon a person other than those specified in the provisions of the code, where the foreign corporation was an insurance company. The acts of 1884 and 1892, provided merely that process might be served upon the superintendent of insurance, not that it must be. A proper service might, therefore, be made upon a foreign insurance corporation under the provisions either of the code or the act of 1884 or 1892."

I have already called attention to the fact that the construction contended for by plaintiffs gives an advantage to foreign over domestic corporations. This point is emphasized in the case of Johnson, et al. v. Hanover Fire Insurance Co. 15 Fed. 97. The case is not exactly in point, because the statute involved, that of Illinois, requiring foreign corporations to designate agents upon whom process may be served, expressly provides that such method of service shall not be deemed exclusive. But the opinion is valuable because of the discussion of the general purpose of such statutes and the reasoning upon the point just referred to. Discussing the Illinois statute, the court says:

"I therefore think that the natural and reasonable inference as to the legislative intent is that the purpose of the act of 1869 was to compel foreign insurance companies who entered upon an insurance business in this state, so to authenticate the agency of some person on whom process could be served that

such company would be concluded by service on such agent or person. If process was served on any other person under the assumption that he was the agent of such company, the company could dispute such agency, probably, even after judgment, if judgment was taken by default. And therefore citizens of this state, having right of action against such foreign companies, might be put to much trouble in proving the agency of the person on whom the process was served.

"It was, therefore, as I think to save this annoyance and trouble to persons bringing suit in this state against such companies that the act of 1869 was passed. But I do not think the legislature intended to enact that process can only be served on an agent appointed under section 22 of the insurance law. * * * The construction contended for by the defendant would give insurance companies an advantage over home or domestic corporations by requiring that service of process could only be made upon a single individual representing the foreign company, while the domestic company could be reached by service 'upon any agent' found within the county or district, in the absence of the president or other superior officers. I cannot believe that the legislature intended to give foreign companies any such advantage, but rather intended that the company should be required to appoint an agent in such manner as to estop it from denying or questioning the validity of the service when made on him, leaving it for suitors to make their election whether they would serve the agent thus appointed, or take the risk of proving the agency of any other agent upon whom service might be obtained."

Finally, in the case of Phelan v. Ganebin, 5 Colo. 14; on rehearing, *idem*, 83; a return showing service upon an agent of the receivers of a foreign corporation was sustained by our supreme court, in 1879, upon the precise ground that the service shown would have been valid if made upon the foreign corporation itself. It was further expressly decided that the service of process upon foreign corporations was governed by section 37 of the civil code of 1877, which has been quoted. From the decision it logically follows that a return showing simply service upon the agent of a foreign corporation is *prima facie* sufficient, the fact of the agency always being one which can be controverted by the corporation served.

I know of no authority to the contrary. Several cases are to be found, decided under statutes relating to foreign insurance companies, analagous to the statute of Tennessee above referred to, and to paragraph 1691 of our general statutes, in which it is held that the method of service of process therein provided for is exclusive. I do not think that these cases constitute the weight of authority, even under such statutes. But whether they do or not is immaterial, since the reasoning upon which they proceed is clearly inapplicable to the statutory provision now under consideration. All those statutes require each foreign insurance company either to designate some specified state officer as its attorney, upon whom process may be served, or to designate some person as its agent, with the proviso that in case of his death, resignation, removal or absence from the state, process may be served upon some specified state officer. Since a state officer is presumably always present at the state capital in the performance

of his public duties, such statutes are sufficient for every contingency, and, therefore, provide a complete, if not convenient, method for the service of process. It is this fact which has controlled the decisions referred to. The inference of exclusiveness is drawn from the fact of completeness; the principle applied being that when a special and complete system of procedure is adopted for any particular subject, such subject ought to be deemed exclusive of any general system which in its terms is broad enough to embrace such subject. The case of Oland v. Agricultural Ins. Co., 69 Md. 248, cited by counsel for plaintiffs, belongs to this class. The reasoning of these cases would be applicable to paragraph 1691 of our general statutes, but clearly not to paragraph 260. which, as has been pointed out, does not furnish a complete system for the service of process upon foreign corporations.

A few other cases may be found in which it is held that a statute requiring foreign corporations to designate agents upon whom process may be served furnishes an exclusive, because it is an *only*, method of service. In the states where such decisions have been rendered there are no statutory provisions corresponding to sub-division 9 of section 38 of our code of civil proceedure, and it is held that statutes making provision for the service of process upon corporations generally apply to domestic, and do not include foreign, corporations. Since, then, the stattutes requiring the designation of agents are the only ones making provision for service of process upon foreign corporations, it necessarily follows that service can be made in no other manner. It also necessarily follows, and is expressly held in such

cases, that, in those states, if a foreign corporation refuses or neglects to designate an agent upon whom process may be served, personal service cannot be made upon it, and a personal judgment cannot be rendered against it. It can only be proceeded against by attachment or other proceeding *in rem*.

To this class belongs the case of Baile v. The Equitable Insurance Company, 68 Mo. 617, also cited by counsel for plaintiffs. That case was decided upon the authority of Middough v. St. Joseph & Denver City R. R. Co., 51 Mo. 520, and the opinion cannot be properly understood without a study of the latter case. In the latter case the action was against a foreign corporation which had not complied with the statute and had not designated an agent for the service of process. It was held that under the statutes of Missouri personal service could not be made upon the defendant, and that jurisdiction could be acquired only by proceeding in attachment. The precise ground upon which the decision was rendered is pointedly emphasized by the dissenting opinion of Mr. Justice Adams, who placed his dissent expressly upon the conclusion that the general statute of Missouri relating to service of process upon corporations was broad enough in its terms to include foreign as well as domestic corporations. That the supreme court of Missouri did not intend to hold that a special method of service provided for in a statute cast in the permissive form is exclusive of all other methods of service provided by law, is clear from the case of The State to the use, etc., v. Han. & St. Jo. R. R. Co., 51 Mo. 532. In that case the action was under a statute subjecting railroad companies to certain penalties for violation of

statutory duties; which statute provided, in case the penalty should be less than one hundred dollars, that "suit may be commenced before a justice of the peace, and may be commenced by serving the summons on any director of such company." Service in the action was made on a station agent under the general statute relating to the service of process upon railroad companies. It was contended that the special method of service provided for was exclusive, but, resting its conclusion upon the permissive words of the statute, the supreme court held that the service made was valid, and that the special method provided was merely cumulative. Since sub-division 9 of section 38 of our civil code is an express provision for the service of process upon foreign corporations generally, it goes without saying that such cases as Baile v. The Equitable Insurance Co. are not in point.

All the cases cited by counsel for plaintiffs, and all which I have been able to find, and which apparently sustain the contention of plaintiffs, fall into one or the other of these two classes.

Upon reason and authority, therefore, I am thoroughly satisfied that paragraph 260 of the general statutes does not furnish an exclusive or even a preferred method of service, but that its sole purpose is to secure within the state the presence of a representative of each foreign corporation doing business here, upon whom process may be served with certainty, when it cannot be served in any of the other methods provided by law; and that under the statutes of this state, as they have existed since 1891, in an action against a foreign corporation which has designated an agent in compliance with said paragraph 260, the

plaintiff has his option to cause service to be made either upon such designated agent or upon any other agent of the corporation who may be found in the county in which the action is brought.

The question next arises, are the president and vice president of a foreign corporation its agents within the meaning of section 38 of the civil code, and is a return of service upon them respectively as president and vice-president sufficient to show valid service upon them respectively as agents? If there can be any doubt upon this question, it must arise upon the return showing service upon the vice-president. It will, therefore, be considered from that standpoint. For if the return showing service upon a vice-president is sufficient, then *a fortiori* will a return showing service upon a president be sufficient.

In the case of Comet Consolidated M. Co. v. Frost, *supra*, a return showing service upon a vice-president was held sufficient by our supreme court under a provision of the code which read as follows: "If the suit be brought against a corporation, service shall be made by delivering a copy of the summons to the president or other head of the corporation, or to the secretary, cashier, treasurer, or general agent thereof; but if no such officer of the corporation can be found in the county, service may be had on any stockholder of such corporation." It will be observed that the term "vice-president" does not appear in this provision. The return, therefore, must have been sustained either on the ground that such officer is included in the phrase "other head of the corporation," or in the phrase "general agent."

A corporation can have but one head. The

phrase "other head of the corporation" is used to denote an officer who, under some other title, performs the duties which generally devolve upon the president. A vice-president can never in any sense be the head of the corporation, unless called upon to perform the duties of the office of president during a vacancy created by the death, resignation, absence or disability of that officer. He can, therefore, never legally be presumed to be the head of the corporation, but might be shown to be such by evidence sufficient to establish the fact. Hence, a return showing service upon a vice-president would not legally show service upon the head of a corporation; and such a return would, therefore, be insufficient as a service upon the head of a corporation, unless it affirmatively showed the inability of the officer making service to find the president, thus raising the presumption that the vice-president was for the time being the head of the corporation. This, the supreme court expressly decided was not required; and from that decision it necessarily follows that the service was sustained, not upon the ground that the vice-president was the head of the corporation, but upon the ground that he was a general agent. We have then, a decision by the supreme court that the vice-president of a corporation is a general agent of it, within the meaning of a statute providing for the service of process; and if he is a *general* agent, *a fortiori*, he is *an* agent. This reasoning is sanctioned by the case of Norfolk & W. R. R. Co. v. Cottrell, 83 Va. 512, s. c. 3 S. E. 123. In that case a return showing service upon a vice-president was held valid under a statute relating to service of process on corporations which provided for ser-

vice on "the president, or other chief officer; in his absence, on certain named officers; and if there are none such, or they are absent, then on any agent thereof, or on any person declared by the laws of this state to be the agent of such corporation." The court said: "The president was a non-resident and absent. The vice-president was not the president, nor was he any other person who was chief officer of the company. The chief officer in this case is the president. But the return does not stop with evidence of service of a copy on this officer. It proceeds 'To Jos. H. Sands, general superintendent,' etc. He is not the chief officer of the company, but does he not come within the general terms of the statute which provides for service 'on *any agent* of the corporation,' and do not these words include the vice-president as well? If such be not the chief officer, they are agents of the company."

In the case of Klopp et al. v. Creston City Guarantee Water Works Co., 52 N. W. 819, the supreme court of Nebraska held a return of service upon a vice-president to be sufficient under a statute which authorized service of process upon a "managing agent."

That the deduction which I have drawn from the case of Comet Consolidated M. Co. v. Frost, *supra*, is sound is demonstrated by the comparatively recent case of Cook v. Imperial Bldg. Co., 152 Ill. 638, s. c. 38 N. E. 914. The statute under which the decision was rendered provides: "An incorporated company may be served with process by leaving a copy thereof with its president if he can be found in the county in which the suit is brought; if he shall not be found in the county, then by leaving

a copy of the process with any clerk, secretary, super-
intendent, general agent, cashier, principal, director,
engineer, conductor, station agent, or any other agent
of said company found in the county." In an action
against a corporation service was had upon one
Eames, who was described in the return as vice-
president of the company. The court said: "It is
true, as appellee urges, that the statutory require-
ments for the service of process must be strictly
complied with in order to give the court jurisdiction
of the party sued; still, it by no means follows that
the court shall not determine the true meaning of
the word 'agent' as used in the statute just quoted."
The court then comments upon the Colorado case
and the Virginia case cited above, and proceeds:
"We have not been referred to, nor have we been
able to find, any decision, under similar statutes,
holding the contrary of the authorities just quoted.
In the light of those decisions and of reason, we are
of the opinion that the vice-president of a corpora-
tion is an agent, within the purview of section 5,
chapter 100, Rev. Stat. 1874. He is a regularly
elected and acknowledged officer of the corporation.
He acts as president in case of the absence of the
latter from duty, exercising such authority as the
president might himself were he present; and al-
though it might be difficult to define with any degree
of certainty what are his ordinary duties, yet we have
no hesitancy in pronouncing him to be an agent of
the corporation. It is urged that even though it
should be held that a vice-president is an agent, still
in this case the officer's return was defective, for the
reason that Eames was not served as agent, but as
vice-president. This position is untenable, for since a

vice-president is an agent, what can it matter whether the officer returned the writ as served upon Eames, agent, or. upon Eames, vice-president? We think that the sheriff's return upon the summons was good and sufficient."

It matters not that the defendant company in this case was a foreign corporation. Mr. Morawetz states the law of comity as to such corporations as follows: "By the common law rule of comity in force throughout the United States, each state extends to all duly incorporated foreign corporations a legal right to carry on business within its jurisdiction. It may, therefore, be said to be a general rule that a corporation can legally carry on its business in the usual way, *and by the usual agencies*, wherever it may find it convenient and profitable to do so." 2 Morawetz, Corp., § 958.

From this general rule of law it necessarily follows, as a corollary, that the law of comity will recognize officers elected by a corporation in the state of its creation, wherever it may go, both in their official capacities and by their titles, so far as may be necessary for the business which it is authorized to transact; and that wherever it may go, the titles of its officers will carry the duties, powers and responsibilities which usually attach to the offices which they describe.

In the Nebraska case above cited the action was against a foreign corporation, and the person served was its vice-president, temporarily within the state.

In the return of service made upon Sullivan in The Farmers' Loan & Trust Company proceeding, he is described as president of the company. From

the evidence in this case it appears that the time of service he was not and never had been, such officer, but was in fact a vice-president. This variance is, in my judgment, wholly immaterial. It is the fact of service which confers jurisdiction; the return is merely the evidence of that fact. The return in this case being sufficient upon its face, a court of equity, which never proceeds upon technical grounds, will not permit the plaintiffs in this action to challenge the judgment on the ground of want of service, except by disproving the fact of service; that is to say, the plaintiffs cannot be permitted to successfully assail the return by showing that Sullivan was not the precise agent named therein, but they must go further and show that he was not an agent at all upon whom service could be properly made. Peoria, D. & E. Ry. Co. v. Duggan, 32 Ill. App. 351. The return of service upon Sullivan, therefore, must in this proceeding be treated as though he were described therein as vice-president.

It is not disputed that he was one of the original vice-presidents and one of the original directors of the corporation. But on July 2, 1891, he addressed a letter to W. A. Underwood, the president of the company, tendering his resignation as vice-president and director. This tender of resignation was presented to the board of directors by the president at a meeting held in New York city on the 27th day of July, 1891. No action was taken by the board thereon; but it is contended on behalf of the plaintiffs that the right of a director of a business corporation to resign is absolute, and that when his resignation is duly presented to the board of directors it becomes effectual, although no action be taken; and hence on the 27th

day af July, 1891, said Sullivan ceased to be vice-president and director of the company. This contentention is supported by authority in a limited sense only.

A corporation has two distinct functions to perform —first, to maintain and perpetuate its legal existence and organization; second, to transact the business for which it is organized. A director, therefore, occupies a dual relation to his corporation—first, that of an officer charged, under the law and by the charter and by-laws of his company, with the performance of certain ministerial duties, which are essential to the maintenance and perpetuation of the legal existence and organization of the company; second, that of a business agent charged with the exercise of certain duties and powers in the management of the business of the company. I think it is perhaps true that a director has the absolute right to terminate his second relation with the corporation whenever he may desire, and without the assent of the corporation. And so it has been held that the resignation of a director duly presented to the board becomes effectual without any action by the latter, for the purpose of relieving the director from any personal liability to third persons on account of the mismanagement of corporate affairs. But I do not think that a director can at will terminate his first relation with the corporation. It would be a most dangerous doctrine to announce, and I think the true rule is that when a person accepts the office of director he impliedly agrees to continue in the office, for the purpose of maintaining and perpetuating the corporate existence, until his term of office expires

or until his resignation has been accepted by the corporation.

The distinction above pointed out is recognized by Mr. Morawetz, and as to the last proposition announced he says: "Directors cannot divest themselves of their legal status as part of the corporation organization except in a manner prescribed by law. If their term of office is fixed by the charter at a definite period, they continue legally to be officers of the company, and are bound to call meetings, and to do such other ministerial acts as are necessary to protect the corporate organization, until their terms of office have expired or their resignation has been accepted." 1 Morawetz Corp., §§ 563,564.

Moreover, the minutes of the meeting of July 27, 1891, show that the resignation of Sullivan was presented by the president, together with those of several other directors, and of the president himself. Venner, one of the plaintiffs in this case, was present, and moved that the resignation of Mr. Underwood be accepted. This motion was seconded, whereupon another director moved as an amendment that all the resignations be laid on the table. This motion was seconded, and upon vote was lost. A vote was then taken upon the original motion, and the resignation of the president was accepted. The president then withdrew from the meeting, and no quorum being left, no further business was transacted.

It further appears from the minutes of the meeting of the directors held in New York on the 23rd day of September, 1891, which was the last meeting at which any business was transacted, that Sullivan

was present as a director, and participated very actively as such in the business of the meeting.

It must be presumed that the Farmers' Loan & Trust Company informed itself as to the status of Sullivan before causing service of process to be made upon him. It had the right to rely upon the acts of the corporation as disclosed by its records.

I conclude, therefore, first, that the resignation of Sullivan never became legally effective; second, that if it could become effective under such circumstances, the corporation is estopped from denying his official status.

I can see no force whatever in the contention that Sullivan, by accepting the office of receiver from this court vacated the office of director. The idea must have been suggested by the fact that the officers of insolvent corporations are generally ineligible to be appointed receivers of them. But the ineligibility of an officer to such an appointment does not arise from his existing connection, but from the bias which might be presumed from his past connection with the corporation. If he were to resign for the purpose of being appointed receiver he would still be ineligible. Then, since his resignation would not remove his ineligibility, conversely, his acceptance of the appointment would not effect an implied resignation.

But there is no positive rule of law which disqualifies an officer of a corporation from being appointed receiver of it. The rule referred to is one governing the discretion of the court making the appointment. If all the parties in interest consent thereto such an appointment can very properly be

made, and numerous precedents may be found therefor.

And besides, Sullivan was not appointed receiver of the corporation. He was merely appointed receiver of certain of its property, which was committed to his custody and management under the direction and control of this court. His path of duty as such receiver did not cross or even touch his path of duty as an officer of the corporation, and I can see no incompatibility whatever between the two positions.

With reference to the service of process in the Central Trust Company case, it is contended that even if service can be legally made upon a vice-president, the service upon Clarence H. Venner was insufficient for the reason that, at the time it was made, The American Water Works Company had been placed in the hands of a receiver by the court of chancery of the state of New Jersey, and was, therefore, beyond the jurisdiction of this court; and that the character and functions of Venner as vice-president had been suspended by the injunction of the same court. This objection embraces the fourth ground upon which the decrees are assailed, and what is here said will dispose of that also.

The laws of New Jersey have no extra-territorial force; neither have the decrees of its courts any extra-territorial effect *in rem*. As to real estate, all the authorities agree that the involuntary transfer of title to all of the property of a corporation, by operation of the law of the state of its domicile, affects only such real estate as is located within the limits of that state. As to personal property, according to

the great weight of authority in this country, the rule is the same; although in England and a few of our states it is otherwise. For the same reason, a receiver loses his official character when he leaves the state in which he is appointed. By the law of comity, a foreign receiver may be recognized by the courts of this state for certain purposes, but not as the receiver of the property located within our jurisdiction. The appointment of E. Hyde Rust as receiver of The American Water Works Company did not effect a dissolution of that corporation; nor did the statute of New Jersey, transferring to him the title to all its property, pass to him the title of the property here in controversy. After his appointment, The American Water Works Company, as a corporation, still existed in this state, vested with the full title to all its property located in this state; and it, and all of its property, and all its officers within our borders were subject to the jurisdiction of our courts in proceedings *in rem*, relating to such property. Especially is this true when, as in this case, the jurisdiction of this court had attached prior to the appointment of the receiver in New Jersey. Cases precisely in point in sustaining the validity of service of process upon an agent of a foreign corporation after the appointment of a receiver in the state of domicile are, Pollock v. Carolina Inter-State Building Ass'n, *supra*; Societe Fonceire et Agricole Des Etats Unis v. Milliken, 135 U. S. 304. As supporting the general principles involved, see Harrison v. Sterry, 5 Cranch, 289; Oakey v. Bennett, 11 How. 33; Howard v. Chesapeake & O. R. Co. 11 App. Cas. D. C. 300; Day v. Postal Tel. Co., 66 Md. 354; T. & P. R. Co. v. Gay, 86 Tex. 571; Filkins v.

Nunnemacher, 81 Wis. 91; Booth v. Clark, 17 How. 322; Cone v. Tuscaloosa Mfg. Co., 76 Fed. 891; 3 Am. & Eng. Ency. Law, p. 572.

This conclusion in no manner conflicts with the case of the American Water Works Company v. The Farmers' Loan & Trust Company, 20 Colo. 203. Through the law of comity, the courts of this state may, and very properly should, refuse to permit a foreign corporation or one of its officers assuming to act in its behalf, to do an affirmative act in violation of the laws of the state of its domicile. But they cannot through comity permit the laws or decrees of court of another state to affect property here situated, or permit themselves thereby to be ousted of jurisdiction over such property. When Venner was served with process, it was his duty to transmit the summons or notice thereof to the receiver, just as it would have been his duty to transmit the same to the governing body of the corporation, if it had not been in the hands of a receiver. There was nothing whatever in the injunction of the court of chancery of the state of New Jersey to prevent him from performing this duty, and we must presume that it was performed. The receiver, if he had desired, would have been permitted, through comity, to intervene and defend on behalf of the corporation.

It is next contended that since it had been deprived of the control of all its property at the time of service upon Venner by the appointment of Sullivan as receiver, The American Water Works Company was not doing business within this state within the meaning of sub-division 9 of section 38 of the code, and therefore said service was void. The phrase "doing business within this state," as there

used, does not mean that at the time of service the foreign corporation must be actively engaged in the general transaction of its business. When such a corporation comes into this state to engage in business, it never ceases to do business within the meaning of the law until every transaction which it has entered upon has been closed, and every liability which it has incurred has been finally settled. As long as a cause of action exists against it in this state, arising upon any business transacted in this state, it is doing business here and is liable to suit in our courts and to service of process under said section of the civil code. This is conclusively settled by the case of Colorado I. W. v. Sierra Grand M. Co., *supra*, in which it was held by the supreme court that the single purchase of machinery by a foreign corporation is a sufficient doing of business in this state to render it amenable to the jurisdiction of our courts.

The next contention is that the service upon Venner was void because he was not in this state on the business of the American Water Works Company, nor as representing that corporation, but on his own private affairs. It is a sufficient answer to this to say that the service was strictly within the letter and the spirit of the code provision relating to service upon foreign corporations, since that provision does not require service upon "a local agent" nor upon a "resident agent," but upon any agent who may be *found* in the county. There can be no doubt that a judgment by default upon such service is valid in this state, no matter how it may be regarded in other states. Pope v. Mfg. Co., 87 N. Y. 137; Porter v. Sewell, etc., Co., 7 N. Y. Supp. 166; Shickle

H. & H. I. Co. v. S. L. Wiley Constr. Co. 61 Mich. 226, s. c. 28 N. W. 77; Reifsnyder v. Am. Imp. Co., 45 Fed. 433.

But, in my opinion, a judgment rendered by default upon such service would be valid in any state. Whether or not valid service can be obtained upon an officer of a foreign corporation accidentally present within the state in which suit is brought, depends upon whether or not the corporation is properly suable in that state. Undoubtedly if a citizen of this state should bring suit in one of our courts against a foreign corporation which has no office and does no business within the state, valid service could not be obtained upon such corporation by serving an officer accidentally within our limits, and a judgment rendered on such service would be void. The reason assigned by all the cases is, not that the officer is accidentally within the jurisdiction, but because, the corporation never having brought itself within the jurisdiction of the court, the officer has no power to subject it to such jurisdiction.

The primary object of the service of process is not to obtain jurisdiction, but to give notice of the pendency of litigation. Jurisdiction attaches secondarily because of the proper service of such notice. If a foreign corporation is properly suable in this state, the courts of other states will recognize the validity of any judgment which is rendered upon process in conformity with the local statute, and which is not contrary to the principles of natural justice. So if a foreign corporation maintains an office in this state, or transacts business herein, it is properly suable in our courts, and all that is required to obtain jurisdiction is that notice shall be given in

conformity with our statute. The notice required, that is upon any agent *found*, is not contrary to the principles of natural justice, for no valid reason can certainly be discovered why notice served upon an officer accidentally within the state is not just as effective as though he were here permanently or upon business of his company. In all the cases which I have been able to examine on this point, where service upon an officer accidently present was held void, it has been put upon the express ground that, in the particular cases determined, the corporation maintained no office or transacted no business within the jurisdiction where service was made. Moulin v. Insurance Co., 24 N. J. L. 222; Fitzgerald and Mallory Constr. Co. v. Fitzgerald, 137 U. S. 98.

In my opinion, therefore, the service upon Dennis Sullivan in The Farmers' Loan & Trust Company proceeding, and the service upon Clarence H. Venner in the Central Trust Company proceeding were valid and sufficient to give the court jurisdiction of the person of The American Water Works Company.

The second ground upon which the validity of the decrees is assailed is that the court did not have jurisdiction over part of the subject matter embraced therein. This contention, also, is based on the case of Venner v. The Denver Union Water Company *supra*, wherein it was held by the court of appeals that the decree entered in The Farmers' Loan & Trust Company proceeding was void in so far as it affected the property which had been formerly owned by The Mountain Water Company.

The mortgage executed by The Denver Water Company to The Farmers' Loan & Trust Company,

which formed the basis of the proceeding, conveyed "all its privileges, franchises, easements, choses in action, estate, property, real and personal, effects and assets, which the said party of the first part now has or may at any time hereafter, during the existence of this mortgage, acquire at any place whatever, whether or not the same be mentioned herein, among which are the following, that is to say: All and singular the following described property, to-wit:" (Then follows a specific description of certain parcels of real estate.) "And also all and singular the water rights, rights of way and incorporeal hereditaments now possessed by said first party, or which it may at any time hereafter acquire up to and during the continuance of the lien of this instrument, and also all the rentals, debts, dues, demands, choses in action, of every kind and nature, including water rents in the said city of Denver, under and by virtue of any contract, resolution or ordinance of said city now in force; or which may be hereafter in force, or in or by virtue of any contract which may inure to the benefit of the said first party or its assigns, and the water rents from all private consumers wheresoever situated, and all water rents of any kind whatsoever or howsoever."

At the time of the execution of this mortgage The Denver Water Company owned other property than that specifically described in the mortgage, which said property was included in the decree of foreclosure, but was not specifically described or mentioned in the complaint. The decree also included certain property which The Denver City Water Works Company had acquired from the Mountain and Beaver Brook companies. The legal title to this property

had never stood in the name of The Denver Water
Company; it was not mentioned or described in the
mortgage executed by it, nor was it mentioned or de-
scribed in the complaint in The Farmers' Loan &
Trust Company proceeding. The plaintiffs' conten-
tion with reference to the decree in The Farmers'
Loan & Trust Company proceeding upon final analy-
sis, then, resolves itself into two objections:

First: That the decree includes property which
though subject to the lien of the mortgage, was not
specifically described or even mentioned in the com-
plaint.

Second: That the decree includes property
which is not only not described nor mentioned in the
complaint, but which was not even subject to the
lien of the mortgage which was sought to be fore-
closed.

The basis of both objections is that the com-
plaint contained no allegations upon which evidence
could be introduced to support the findings and
decree of the court with reference to those two
classes of property. These two objections I will
consider in their order.

The argument of the plaintiffs is given some
color by the general expressions contained in §
1462 of Jones, Mortgages, (4th Ed.); but an examina-
tion of the cases cited by the author shows that
he was considering the question purely from the
standpoint of good pleading; and was endeavoring
to state what the result should be if such defects as
are here complained of were taken advantage of by
demurrer or motion. The question here involved is
one of jurisdiction, and it is for us to determine what

allegations in a complaint are sufficient to support a decree of foreclosure entered upon default.

It is now thoroughly settled as an element of jurisdiction that the validity of a judgment cannot be sustained, unless it be responsive to the issues made by the pleadings. It was upon this principle that the decision was rendered in the Venner case. I have adopted the expression "responsive to the issues made by the pleadings" because it has been sanctioned by several courts of the highest authority. I think, however, that it is unfortunate in that it is liable to be misleading, and that it has been the source of misconception in this case. A brief examination of the cases cited by the court of appeals will furnish a sufficient basis from which to ascertain the true meaning of the rule.

The leading case upon the subject is Munday v. Vaile, 34 N. J. L. 418. That was a suit in ejectment, in which the sufficiency of one of the defenses depended upon the validity of a certain decree which had been rendered by a court of chancery. A filed a bill in chancery in which he alleged that he had an equitable lien upon certain real estate owned by B, and that B for the purpose of defrauding him and preventing the enforcement of his lien had conveyed the property to C in trust for the use of his, B's, family. The bill prayed that the conveyance by B to C should be decreed to be fraudulent as to A's claim. It is manifest that A stated no cause of action which entitled him to disturb the legal title of the trustee or the equitable rights of the *cestui que trust*. All that he showed himself entitled to, and all that his bill claimed, was that the property in the hands of the trustee should be subject to his equit-

able lien. The court nevertheless decreed that the conveyance from B to C was absolutely null and void and that it should be cancelled.

In Reynolds v. Stockton, 43 N. J. Eq. 211, the suit was instituted for the purpose of determining the rights of various parties to a specific trust fund which had been deposited with the superintendent of insurance of the state of New York. The court, in addition to disposing of the trust fund which formed the subject of the action, departed entirely from the record and rendered a personal judgment against one of the parties. The case of Reynolds v. Stockton, 140 U. S. 254, 269, was the same case carried on error to the supreme court of the United States, by which the judgment of the New Jersey court was affirmed.

In Gille v. Emmons, 48 Pac. 569, 570, it appeared that a husband had executed a certain promissory note which was secured by a mortgage executed by himself and his wife. The holder of the note instituted a suit for foreclosure and for judgment upon the note secured. He made the husband and wife both parties defendant, and prayed a personal judgment against the husband for the amount due on the note, and for foreclosure of the mortgage. The court decreed the foreclosure and rendered a personal judgment against both the husband and wife on the note.

In Dunlap v. Sutherlin, 63 Tex. 38, a cause of action was stated in favor of one party in the complaint, and judgment was rendered in favor of another and different party.

In Hume v. Robinson, 23 Colo. 359, a sub-contractor instituted a suit to foreclose a mechanics',

lien. The owner of the building and the contractor were made parties defendant. The plaintiff demanded a foreclosure of his lien and a personal judgment against the contractor. The complaint alleged no privity of contract between the plaintiff and the owner of the building, and made no prayer for personal judgment against such owner. The court, nevertheless, foreclosed the lien and entered personal judgment in favor of the plaintiff against the owner of the building.

In all these cases the judgments were held void; and in each and every case it will be observed, first, that a complete cause of action was stated, which if supported by sufficient proof would entitle the plaintiff to recover a judgment of a particular character, second, that the judgment actually rendered was not of the character and nature which the law would authorize to be rendered on the cause of action stated; third, that under no state of evidence material and relevant to the cause of action stated would it be possible for the plaintiff to be entitled to the judgment rendered.

In every case which I have been able to examine, decided on this principle, these three conditions have existed; and that they furnish the key to its true meaning is clear from the illustrations used by the courts. Thus in Munday v. Vaile it is said: "Persons, by becoming suitors, do not place themselves, for all purposes, under the control of the court, and it is only over those particular interests which they choose to draw in question that a power of judicial decision arises. If, in an ordinary foreclosure case, a man and his wife being parties, the court of chancery should decree a divorce between them, it would

require no argument to convince everyone that such a decree, so far as it attempted to affect the matrimonial relation, was void." And in Reynolds v. Stockton, *supra*, it is said: "A judgment for the recovery of the possession of real estate, rendered in an action whose pleadings only disclose a claim for the possession of personal property, cannot be sustained, although personal service was made upon the defendant."

It is precisely the same principle which, carried into the domain of criminal law, avoids a sentence which is not of the nature and character as that affixed by law to the offense upon which the conviction is had. For instance, upon a charge and conviction of assault and battery, sentence of imprisonment in the state penitentiary, though imposed by a court having jurisdiction of the offense and of the person of the defendant, is absolutely void.

The principle means, therefore, that to be valid, a judgment must be of the kind and character which the law authorizes to be rendered upon the cause of action stated in the complaint, and upon no other; and if a court should depart from the record and render a judgment which could be appropriate only to a cause of action not stated or attempted to be stated, then such a judgment is void.

The rule is not designed to punish bad pleading, but to protect the fundamental right of the citizen to his day in court. Brought down to its final analysis, it means nothing more than that a party who is brought into court to answer one charge shall not have judgment rendered against him upon another and different charge. It means, as well said by the supreme court of the United states, in Reynolds v.

Stockton, *supra*, "That when a plaintiff tenders one cause of action, and in that suit, service on, or appearance of, the defendant is made, a subsequent judgment therein, rendered in the absence of the defendant *upon another and different cause of action than that stated in the complaint* is without binding force within the courts of the same state, and, of course, notwithstanding the constitutional provision heretofore quoted, has no better standing in the courts of another state.

It is not a rule which vitiates a just judgment, because rendered upon a cause of action which is insufficiently or defectively stated, but it vitiates a judgment which is unjust because rendered upon a cause of action not stated or even attempted to be stated.

Let us apply the rule to the decree in question. The Farmers' Loan & Trust Company filed its complaint, alleging a cause of action for the foreclosure of its mortgage. It alleged the execution and delivery to it of the mortgage and default thereunder; described the property in the terms in which it was described in the mortgage; and prayed that the debt due might be ascertained, a time fixed for the payment thereof, and, in case of a default in payment, that its lien be foreclosed upon all the property subject to the mortgage, and that the same be decreed to be sold. Let it be conceded that this complaint is insufficient because of ambiguity or uncertainty, or for want of particularity or proper technical averments. Let it be conceded that upon special demurrer or motion it should have been held to be defective and insufficient; nevertheless, it stated a a cause of action; and, in the absence of any objection

to its form, it was sufficient to permit the introduction of evidence to determine what property was subject to the lien of the mortgage and a description thereof; for that was the precise case to which the defendant was summoned to appear and answer.

If the decree in the case, therefore, includes only the property which was subject to the lien of the mortgage being foreclosed, it was responsive in every sense to the cause of action stated in the complaint. It would indeed be a most remarkable perversion of justice, if, years after a foreclosure proceeding, when titles thereunder had become settled, a mortgagor could come into a court of equity and successfully demand that the decree of foreclosure be set aside, because certain portions of the property decreed to be sold had not been specifically described or mentioned in the complaint, when it is conceded that such property was embraced within the general terms of the complaint, that it was subject to the lien of the mortgage, and that of right it should have been sold for the purpose of satisfying the debt.

A most admirable statement of the rule and its limitations is set forth in the case of Spoors v. Coen, 44 Ohio St. 497, as follows: "But a judgment rendered by a court of competent jurisdiction in a case brought before it, however erroneously the jurisdiction may have been exercised, is one thing, and a judgment entered by a court of like jurisdiction in a case not before it, is another and different thing. In the one case its judgment may be erroneous; in the other it is void. To bring a cause before a court, competent to adjudicate it, it is not only necessary that the parties should be *in jus vocatio*, cited or summoned in the manner required by the law of

proceedure, but a case must also be made, or stated, affecting the party against whom relief is asked. The power to hear and determine a cause is defined to be jurisdiction." And to use the language of Ranney, J., in Sheldon v. Newton, 3 Ohio St. 494, "It is *coram judice* whenever a case is presented that brings this power into action." "But," he adds, "before this power can be affirmed to exist, it must be made to appear that the law has given the tribunal capacity to entertain the complaint against the person or thing sought to be charged or affected; *that such complaint has actually been preferred*; and that such person or thing has been properly brought before the tribunal to answer the charge therein contained. It is not necessary that the statement of the claim should be so perfect in form and substance, as to be free from objection on demurrer, to confer jurisdiction upon the court to hear and determine it. Buchanan v. Roy, 2 Ohio St. 252. If the case presented invoked the jurisdiction of the court and could have been perfected by amendment, the judgment of the court thereon could not be treated as a nullity. But, in order that a party may be permitted to amend, there must be something to amend by. So, unless a case is presented which could be amended, there is no case upon which a judgment can be rendered." To the same effect see: Fred Miller Brewing Co. v. Capitol Ins. Co., 82 N. W. 1023; Askren v. Squire, 45 Pac. 779, and cases cited.

The same principle was recognized in Steinhauer et al. v. Colmar, 11 Colo. App. 494, in which it is said: "The first averment was that the judgment against the Mutual Aid Association was void because

there was no evidence to sustain it, and because the complaint upon which it was rendered did not state a cause of action. In the argument no notice is taken of this allegation, and we shall not notice it except to say that a judgment is not void merely because it was rendered without evidence or upon an insufficient complaint."

The case of Spoors v. Coen suggests what I believe to be the true test to determine the sufficiency of a complaint to support a judgment by default. In some of the cases cited emphasis is laid upon the fact that no amendments had been made to the pleadings which would justify the rendition of the judgment. But the amendments there referred to were entirely different from the amendments referred to in the Ohio case. For instance, in Reynolds v. Stockton, *supra*, where the complaint was filed to determine the rights of parties to a trust fund, the complaint as filed was perfect for the purpose for which it was filed. No suggestion is made that any amendment was necessary to cure a defect in the cause of action stated. Consequently the amendment referred to (and it will be observed that the court does not hold that the complaint could have been amended) was an amendment which would either introduce a new cause of action or which would introduce an element wholly foreign to the scope of the cause of action originally stated. In Spoors v. Coen the amendment referred to is an amendment which would be allowed for the purpose of making a defective cause of action complete or an uncertain cause of action certain. The test, then, is this: If a judgment be rendered by default upon a cause of action which is defective because of am

biguity, uncertainty or want of particularity or of proper averments, and if the judgment as rendered is of the nature and character which the law would award upon the cause of action if amended to cure such defects, then the complaint is sufficient and the judgment is valid; on the other hand, if a judgment be rendered which would not be responsive to the complaint except by amending so as to introduce a new cause of action or an element wholly foreign to the scope of the cause of action originally stated, then the complaint is insufficient, and the judgment is void in so far as it departs from the cause of action stated.

There can be no doubt that in the foreclosure proceeding the court could have permitted an amendment to be made for the purpose of describing the property which forms the subject of this objection, and that such amendment would have introduced neither a new cause of action nor any element foreign to the scope of the case as originally stated.

The second objection presents an entirely different question. It will be remembered that the legal title to the Mountain property and the Beaver Brook property was never vested in The Denver Water Company. Apparently, therefore, this property was not subject to the lien of The Farmers' Trust Company mortgage. It was for this reason that the court of appeals, in Venner v. The Denver Union Water Compay, *supra*, held the decree void as to the Mountain property. If it be a fact that said property was not subject to the lien of that mortgage, then the position of the court of appeals is absolutely unassailable, because judgment was ren-

dered upon a matter which was wholly outside of the scope of the cause of action stated.

But are we justified, in this proceeding, in assuming that said property was not subject to the lien of the Farmers' Loan and Trust Company mortgage, simply because the legal title to it was never vested in The Denver Water Company? From the evidence in this case, there is strong ground for believing that The Denver City Water Works Company was but the *alter ego* of the Denver Water Company, and if it was a fact that the latter company caused the former to be organized merely as a disguise, in order that it might, under another name, acquire property for the purpose of avoiding the lien of The Farmers' Loan & Trust Company mortgage, then its action was a fraud upon the mortgagee, and the property acquired by it under the new name would be subjected in equity to the lien of that mortgage. Whether or not it was subject to that lien was a mixed question of law and fact, and if a case was presented which authorized the court in the foreclosure proceeding to inquire into the matter, it was a question which it had full jurisdiction to hear and determine; and its decision, if wrong, was not void, but merely erroneous, and could be correct only upon error or appeal.

Assuming that there are no averments whatever in the complaint touching the matter, was a case presented which upon default would authorize the court to go into this matter? Applying the test which has just been laid down, let us assume that the plaintiff had been required to amend its complaint by alleging such facts as would bring the Mountain and Beaver Brook properties within the lien of its mortgage, would the amendment, if made, have introduced a

new cause of action or an element wholly foreign to the scope of the cause of action as originally stated? In my judgment it would not, because the scope and object of the cause of action stated was coextensive with the lien of the mortgage sued upon, and the effect of the amendment would have been simply to define the scope and object of the action by defining the limits of the lien. Evidence introduced under such an amendment would not have tended to enlarge the plaintiffs' primary right or the defendants' primary duty; nor would it have tended to extend or enlarge the scope of the remedy sought, or the relief prayed for. On the other hand, it would have been merly explanatory, for the purpose of showing that certain specific property was included within the lien of the mortgage, within the scope of the remedy and of the prayer for relief. But it may be argued that the complaint showed only a demand for forclosure upon such property as was owned or acquired by The Denver Water Company, and, therefore, the defendant had no notice that the plaintiff would attempt to extend the lien to property which had been acquired by The Denver City Water Works Company. This is a mere *petitio principii*, based upon the assumption that the lien of the Farmers' Loan & Trust Company mortgage extended only to property the legal title to which might become vested in The Denver Water Company. This is not true. The lien of the mortgage extended to all property which The Denver Water Company might acquire either in law or in equity. Central Trust Company v. Kneeland, 138 U. S. 414. The complaint informed the defendant of this fact. The defendant was duly summoned; it was its duty to examine the complaint and

ascertain the cause of action stated against it. If it had done so, it would have learned that the plaintiff proposed to enforce its mortgage against all properly upon which its lien could be established. If the defendant had any objection to make to the form of the complaint, it was its duty to make it then. It made no objection and its default carried with it an implied assent to the introduction of any evidence which would be admissible for the purpose of proving the extent of the lien of the plaintiff's mortgage. In this proceeding it must be assumed that the evidence introduced for the purpose was sufficient to justify the finding and decision of the court, and that the property in question was in equity subject to the lien of The Farmers' Loan & Trust Company mortgage.

But is the complaint barren of allegations? In the thirteenth paragraph it is alleged that on or about the 12th day of November, 1890, the said Denver Water Company caused a new corporation, called The Denver City Water Works Company, to be formed, organized under the laws of the state of Colorado, and that on or about the 15th day of November, 1890, and after the organization of the last named company, the said Denver Water Company, by deed conveyed a large portion of its property to said Denver City Water Works Company. And in the fourteenth paragraph it is alleged that at the same time The Denver Water Company conveyed by deed all the remainder of its property to James B. Grant in trust for the use and benefit of the said Denver Water Company. The statement that a corporation had caused a new corporation to be formed and had conveyed to it all of its property, either

directly or through a trust, is certainly susceptible of the legitimate inference that the new corporation was but a transformation of the old. In the fifteenth paragraph it is charged that on or about the 25th day of April, 1891, the said Denver City Water Works Company by an instrument purporting to be a deed, assumed to convey *all its property real and personal,* and all its rights, privileges and franchises, to a company pretending to have been formed and organized under the laws of the state of New Jersey, called The American Water Works Company (of New Jersey), and soon thereafter transferred the possession of its property and the control of its business to the said pretended American Water Works Company (of New Jersey), which pretended corporation thereafter assumed to own, possess, manage, operate and control the property, business and affairs of the said Denver City Water Works Company, but which said conveyance, if valid and effectual as between the said Denver City Water Works Company and the said American Water Works Company, was nevertheless subsequent and inferior to all the rights, claims and liens of the plaintiff in and to said property. This constitutes a direct averment that the mortgage of The Farmers' Loan & Trust Company was a lien upon all the property which had been conveyed to The American Water Works Company. These allegations are followed by a prayer that a receiver be appointed to take possession and have the care, custody and control of *all the property, legal and equitable,* of the said defendants, The Denver Water Company, The Domestic Water Company, The Denver City Water Works Company, The American Water Works Company (of New Jersey), etc. Upon what

theory could the plaintiff ask to have a receiver appointed for all of the property of The American Water Works Company unless it claimed a lien upon such property by vritue of its mortgage? Manifestly the complaint was framed upon the theory that The Denver City Water Works Company was a successor in interest to, and but another name for, The Denver Water Company, and that all the property which had been acquired by The Denver City Water Works Company was acquired for the purpose of enlarging and extending the plant of The Denver Water Company, and was subject to the lien of the mortgage. In this respect the complaint is undoubtedly defective as a pleading, but, in my judgment, sufficient is averred to give notice to the defendant, The American Water Works Company, that the plaintiff intended to assert a lien upon all the property which had been conveyed to it by The Denver City Water Works Company.

The objection to The Central Trust Company decree is that it embraces the Grant trust estate. What has already been said with reference to The Farmers' Loan & Trust Company's decree applies here. Undoubtedly the Grant trust estate had been created for the purpose of exempting the property therein included from the lien of the Central Trust Company mortgage. Whether it was sufficient to accomplish this purpose was a question of law. It was a mere passive trust. Grant was vested with the naked legal title. The whole beneficial interest in the estate became vested in equity in The Denver City Water Works Company. Whether or not it was subject to the lien of the mortgage was a question which the court in the foreclosure proceeding had full jurisdiction to deter-

mine. If it erred in its decision the mistake could be corrected only on error or appeal.

But it is not necessary to rest the decision on these grounds. Let it be assumed that the decree in The Farmers' Loan & Trust Company's case is void so far as it relates to the Mountain property and the Beaver Brook property, and that the Central Trust Company decree is void so far as it relates to the Grant trust estate. The invalidity of the decrees as to those parcels of property certainly cannot affect their validity as to the residue. No case has been cited which so holds, nor on principle can I conceive of any reason why the entire decree in the forclosure proceeding should be deemed void because parcels of property are improperly included therein and over which the court had no jurisdiction.

What, then, is the result? It is certain that The American Water Works Company acquired all of its right to the property in controversy from The Denver City Water Works Company, and took it all with the possible exception of the Grant trust estate, subject to the lien of the Central Trust Company, mortgage. The foreclosure of that mortgage, therefore, extinguished its title to all of its property with the exception or the Grant trust estate. It is certain that the Grant trust estate was subject to the lien of The Farmers' Loan & Trust Company mortgage and that the foreclosure of that mortgage extinguished the title of The American Water Works Company to the residue of its estate. So that the two foreclosures supplemented each other, and the infirmity of each was corrected by the validity of the other. The result of their concurrent and joint action is that the title to the entire property involved in this contro-

versy has been divested from The American Water Works Company, and through intermediate conveyances is now lodged in The Denver Union Water Company, the defendant in this action.

The specifications of irregularities and errors upon the face of the proceedings, which constitute the third ground of objection to the decrees, are all covered by what has been said, with the exception of that relating to the appointment of Sullivan as commissioner to make the sales under the decrees. It is contended on the authority of Blitz v. Moran, recently decided by the court of appeals and reported in 4 Colo. Dec. 412, that the orders of sale should have been directed to the sheriff of Arapahoe county.

I do not think that the court committed error in appointing Sullivan. § 163 of the civil code provides: "A receiver may be appointed by the court in which the action is pending * * * after judgment to dispose of the property according to the judgment, or to preserve it during the pending of an appeal." If this language means anything, it means that in a proceeding *in rem*, where judgment is rendered for the sale of the property involved, the court has the power to appoint a person to dispose of it according to the judgment, and it is wholly immaterial whether the person so appointed be designated as a receiver or as a commissioner. United Water Works Company v. Farmers' Loan & Trust Co., 11 Colo. App. 225.

But assume that the appointment of a commissioner was erroneous, it cannot be pretended that the corporation was prejudiced thereby in any of its rights. Since the property was to be sold, it could

make no difference whether the sale should be made by such commissioner or by the sheriff. Nor could such error affect the validity of the decree or of the sale made by the commissioner. In Blitz v Moran, *supra*, it was held that such an appointment was merely an error, and that a deed made by a commissioner erroneously appointed by a court in a foreclosure proceeding to make sale of property, no steps having been taken to procure a reversal of the decree, conveys the title of the party against whom the decree was rendered, and that title is unaffected by the error of the court.

The last ground upon which the decrees are assailed is alleged fraud in procuring the same, which will be considered upon the basis of the finding already made, namely, that in the foreclosure proceedings the court had jurisdiction of the person of The American Water Works Conpany. And this, indeed, is the only theory upon which the question of fraud is material to the plaintiffs' case; for if the court did not have such jurisdiction, then the decrees are absolutely void—fraud or no fraud.

From the inferences drawn by plaintiffs' counsel from the evidence, it would appear that a vast conspiracy was formed, the object of which was to wreck The American Water Works Company and to despoil its stockholders of their interests in its property. It was not a conspiracy of direct formation, but of gradual evolution. It began with Underwood and his confederates in the directory, and absorbed, first the holders of the underlying bonds, and next The Farmers' Loan & Trust Company and the holders of the seven per cent. bonds. For nearly three years, the Central Trust Company and the holders of the

five per cent. bonds fought against its machinations, and then succombed; and finally The Citizens' Water Company joined the unholy alliance. It is charged that the suits in foreclosure were part and parcel of this fraudulent conspiracy; that said suits were begun solely for the purpose of effecting its object; that the decrees were obtained and were used for that purpose, and that it was through their instrumentality that the conspiracy became successful.

This is not an action to avoid a contract or to cancel a conveyance on the ground of fraud, but an action to set aside the solemn decrees of a court of the highest original jurisdiction. Courts never inquire whence suitors come, when they bring genuine causes of action; nor, if upon sufficient and competent evidence they obtain judgments, do courts inquire whither they go. Their motives and purposes in instituting actions and the ulterior designs for which they may wish to employ their judgments are never subjects of judicial inquiry in such actions. Fraud in a legal sense can never be predicated upon the exercise of a legal right, if it be exercised under the forms of procedure established by law. Hence, it is well settled that the fraud which moves a court of equity to vacate a judgment or decree is not the fraud in a moral sense which may enter into the motives of the party obtaining the judgment or decree, but fraud in a legal sense, which is committed in the very act of obtaining the judgment; or, as it is sometimes expressed, which enters into the very concoction of the judgment itself. The only exception to the rule is that equity will sometimes avoid a judgment rendered upon a cause of action tainted with fraud, if it shall be made clearly to appear that the fraud was

not known to the defendant at the time of the trial and could not have been discovered by him with the exercise of reasonable diligence. Morris v. Tuthill, 72 N. Y. 575; Davis v. Flagg, 35 N. J. Eq. 491; Dickerman v. N. Tr. Co., 176 U. S. 181; McMullen v. Ritchie, 64 Fed. 253; Toler v. East Tenn. Ry. Co., 67 Fed. 168.

The court, therefore, cannot enter into the domain of morals to speculate with plaintiffs upon the motives of The Farmers' Loan & Trust Company in instituting its action. The question is, did it hold a valid and subsisting mortgage; had a default occurred thereunder; was its case stated so as to invoke the jurisdiction of the court; were the defendants duly summoned? If so, no matter what its motives may have been, it was entitled to a hearing which the court could not deny; and, upon the introduction of competent and sufficient evidence to sustain its complaint, it was entitled to a decree, which the court was powerless to withhold.

Whenever the aid of equity is invoked to avoid a judgment or decree on the ground of fraud, the first question which it propounds to the complainant is, did you have a meritorious defense to the action, and if so, what reasonable excuse have you to offer why that defense was not presented? And unless a meritorious defense be shown and a reasonable excuse for the failure to present it at the trial, the complainant cannot be heard.

To sustain an original bill to set aside judicial proceedings for fraud, therefore, there must be an averment of such facts as, if found, would show a meditated and intentional contrivance by one or more of the litigants to keep the complainant and the court

in ignorance of the real facts, whereby a wrong conclusion was reached, and a positive injury done to the party complaining, without neglect or inattention on his part. The rule is thus tersely stated by the supreme court of Illinois: "To entitle a defendant to relief against a judgment or decree on the ground of fraud, accident or mistake, it must be made evident that he had a defense upon the merits, and that such defense has been lost to him, without such loss being attributable to his own omission, negligence or default." Ward v. Durham, 134 Ill. 195. To the same effect, see McDowell v. Morrell, 5 Lea (Tenn.) 278; White v. Crow, 110 U. S. 183; Finch v. Hollinger, 47 Ia. 173; Sauer v. Kansas City, 69 Mo. 46; Kimberly v. Arms, 40 Fed. 548; Jones v. Bradley, 8 Colo. App. 178.

It cannot be disputed that the Farmers' Loan & Trust Company held a valid mortgage. It does not appear that a default thereunder had been caused by any act or contrivance on its part or the part of the bondholders, fraudulent or otherwise. It does not appear that any artifice, trick, deception, misrepresentation, fraud or inducement was used for the purpose of preventing the defendant from making whatever defense it may have had to the action. On the contrary, it does appear that The American Water Works Company, through its officers and through its receiver, was fully informed of the entire proceedings from the beginning to the end, and had a full, free and fair opportunity to resist the same; and it further appears that Venner, the real plaintiff in this action, over the shoulder of the Central Trust Company, did in fact make as vigorous a defense as could possibly have been made. It does not appear

that any false or perjured testimony was employed for the purpose of securing the decree or that a greater amount was adjudged to be due and owing than was in fact due and owing. Nor does it appear that the defendant really had any meritorious defense, which, if interposed, would have defeated the action. This being so, the complainant was entitled to a decree, which the court could not deny. It cannot be pretended that the decree rendered is intrinsically unjust, unless, perhaps, in respect to the amendment ordering a sale of the Mountain and Beaver Brook properties. As to that it may be said, —first, if the court did not have power to make it, it is absolutely void and counts for naught; second, if the court did have power to make it, there is not the slightest ground for even suspecting that it was procured by any fraudulent means or for any fraudulent purpose. Whatever, therefore, Underwood, or Sullivan, or Hartzell, or any other person who participated in the proceedings, may have done or may have omitted to do, is absolutely immaterial; for since the decree was right and just, it must conclusively be presumed that the result would have been the same if those persons had not participated therein. And what is said of the decree in The Farmers' Loan & Trust Company case is true also of the Central Trust Company proceeding.

There is a broad distinction between fraud in a decree, which vitiates the decree itself, and fraud in the use of a decree, which affects not its validity, but which may avoid the result accomplished through its instrumentality. Several of the allegations contained in the complaint, particularly those relating to collusion and fraudulent agreements between the

seven and five per cent. committees, and between the reorganization committee and The Citizens' Water Company, appear to have been framed upon the theory that, if those matters had been communicated to this court during the foreclosure proceedings, the decrees would not have been entered. But the power of the court can be exercised only under the forms of procedure and the rules of evidence established by law.

In Dickerman v. N. Tr. Co., *supra*, the action was to foreclose a mortgage securing an issue of bonds which provided that the trustee should have power to declare the principal and interest upon the bonds should be made immediately payable, after any execution should be levied or sued out against the chattels or property of the company, and such company should not forthwith, upon such execution being levied or sued out, remove, discharge, or pay the same. It appeared that on a certain day a bondholder began suit against the company before a justice of the peace upon six coupons. The summons was served upon the president of the company at five o'clock in the afternoon. On the same day, although the summons was not returnable for six days, the president appeared before the justice and consented to an immediate trial, which resulted in a judgment in favor of the plaintiff. An execution was immediately issued and placed in the hands of a constable, about half past five o'clock. Later on the same day the trustees declared a default under the mortgage, because of the non-discharge of the execution, and took possession of the company's property. It appeared that the debt upon which suit was brought by the bondholder was just, due and owing, and that the

company had no defense thereto, and that he was entitled to a judgment. One of the defenses in the foreclosure proceeding was that the entire proceeding before the justice of the peace was collusive and fraudulent, and therefore void, and that no default had occurred under the mortgage. The court said: "We have no doubt that this judgment was collusive in the sense that it was obtained by the plaintiff and consented to by the defendant company for the purpose of giving the trustees a legal excuse for declaring the principal and interest of the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioner's case. Collusion is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law,' and in similar terms by other legal dictionarians. It implies the existence of fraud of some kind, the employment of fraudulent means or of lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law, and with a due regard to the rights of parties, it is no defense that the plaintiff may have had some ulterior object in view beyond the recovery of a judgment, so long as such object was not an unlawful one." In Morris v. Tuthill, 72 N. Y. 575, which was also a suit to foreclose a mortgage, the court observed: "The facts that the assignor of a mortgage and his assignee acted in concert with a view unnecessarily to harrass and oppress the mortgagor, and with intent to prevent payment, to the end that the equity of redemption might be fore-

closed, and they become purchasers for less than the value, do not constitute a defense to an action to foreclose a mortgage. So also, the facts that the assignee took title from motives of malice, and solely with the view to bring an action, and that the assignor assigned from a like motive, and without consideration, furnish no defense, and do not impeach plaintiff's title. It is sufficient to sustain the action that the mortgage debt is due, has been transferred to and is owned by the plaintiff, and the mortgagor can only arrest the action by paying or tendering and bringing into court the amount due.

"If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defense to a foreclosure that the mortgagee was animated by hostility or other bad motives."

Undoubtedly, therefore, this court could not have permitted such an issue as has been suggested to be injected into the foreclosure proceedings. It would have been compelled to say to the defendant, "The plaintiff herein is pursuing its strict legal right under the forms of law, and the only way in which you can arrest this action is 'by paying or tendering and bringing into court the amount due.' If the plaintiff herein is engaged with other persons in an unlawful conspiracy to deprive you of your legal rights by fraudulent means, then you may have an independent, affirmative cause of action, which you must assert in a proper proceeding, seeking either to prevent them by injunction, from doing what they threaten to do, or to set aside what they may do after it has been consummated."

Under my conception of the law, therefore, the complaint in this case does not state a cause of action —nor upon the evidence which has been introduced can a cause of action be framed,—which will entitle the plaintiffs to relief against the decrees on the ground of fraud.

The charges, then, relating to the agreements between the several committees, can be material only upon the theory suggested by counsel for the receiver, namely, that they constituted an unlawful combination to stifle competition in bidding at the sales. Their bearing upon this question necessitates a consideration of the testimony, which, because of the vast field covered, must be of the most general character.

The consolidation of the Denver and Omaha plants was effected at a most unfortunate time, because of the great financial depression which prevailed throughout the country, and because the Denver plant found itself in deadly competition with a most formidable rival, namely, The Citizens' Water Company. The chief purpose of the consolidation, so far as the Denver interests were concerned, was to make it possible to secure funds with which to extend and enlarge the facilities of the Denver plant, so as to enable it to hold the field against this rival. An effort has been made to show that the expenditures incurred for this purpose, under the supervision of the executive committee, were wasteful and extravagant, and were purposely made so, to embarrass Venner and to precipitate The American Water Works Company into insolvency and ruin. The evidence does not warrant such a conclusion. It appears that the funds were called for more rapidly than anticipated,

but they did not exceed the amount contemplated by the agreement of consolidation, and the expenses were incurred upon the best practical and scientific advice that could be obtained. Moreover, no adequate motive can be discovered at this time for any such design.

The misfortunes of The American Water Works Company were due solely and entirely to the inability of Venner to finance the new enterprise, which was undoubtedly caused by the fact that at that time it was almost impossible to float western securities in any market upon any conditions. He had the most supreme confidence in himself, and he undoubtedly believed that, if given but a little time in which to recover his strength, he would see the fruition of his hopes. The miraculous sometimes happens, and there is a bare possibility that he might have been able to extricate himself and the company from the unfortunate position in which they were placed.

But in a rapidly growing city, where there is strong competition, no enterprise which depends for success upon public patronage can stand still and live. It must grow or perish. The Citizens' Water Company was a vigorous and active rival. It was daily extending its facilities and daily seeking to undermine the contracts of the Denver plant with its private consumers, and there is just enough evidence to indicate that it was attempting through the medium of municipal politics to strike a blow at its public contracts. The conditions, then, to men less buoyant and confident than Venner, naturally presented a strong probability that, paralyzed by lack of funds and consequent inactivity, and by the deadly miasma

which always emanates from apparent failure, the Denver plant would fall an easy prey to the vigorous and aggressive hostility of its rival, and that a valuable property would be rendered valueless.

Underwood and Sullivan undoubtedly realized this condition, and they further realized that the odium of such a result would naturally attach to them as members of the executive committee. Unwilling to incur the responsibility of a catastrophe which they were powerless to avert, they sent in their resignations; and their action in so doing was, in my opinion, entirely justifiable. Since they had been largely instrumental in affecting the consolidation, and had thereby unwittingly contributed to placing the value of the property in peril, I can readily understand how the most honorable motives could have inspired them to manifest anxiety and concern as to the value of the securities, especially of the underlying and the seven per cent. bonds.

But let it be conceded that the malice of Underwood directed the attention of the bondholders to the condition of affairs in Denver, and suggested and urged that foreclosure proceedings be instituted. It cannot be denied that they held valid bonds, secured by valid mortgages; that a default had occurred thereunder which entitled them to foreclose; that they saw the legal title to the property, on which rested the value of their securities, vested in an insolvent corporation, torn by internal dissentions; and that the conditions fully warranted the reasonable belief that their interests were in jeopardy. Under these circumstances, in proceeding to foreclose, they acted only as prudent men, and kept strictly within their rights, both legal and moral.

From this point, there is no ground upon which even a suggestion of fraud can be predicated, for the plain and obvious reason that there was no necessity for the practice of fraud to bring about the exact result which was accomplished. The American Water Works Company was entirely without resources, and absolutely helpless. The one person in whom all of its hopes centered had been swept away by the flood which had engulfed hundreds of others as able, brilliant and as daring as himself. Practically the corporation was an empty shell, from which the soul had fled. Dead and shrouded, it was ready for burial. To divest it of its title to every shred of its property, the bondholders needed not to invoke the aid of fraud; it required only that they proceed in an orderly way to enforce their strict legal rights, under the regular forms of legal procedure.

The events from this time on are detailed in volumes of testimony which are wholly immaterial, for the reason that they merely recite the story of the quarrel of the heirs over the division of the estate of the deceased. In The Farmers' Loan & Trust Company proceeding, the Central Trust Company appeared and answered, and bitterly fought the contentions of the plaintiff, from every position on which it could find a footing. After that cause had been carried to the court of appeals on error, the struggle still contined in court and out of court until the fall of 1893, when the five per cent. committee was organized. Then began the period of negotiations between the seven and five per cent. committees, which continued until January, 1894, when a compromise was effected, and a reorganization committee was appointed. Then followed a period of negotia-

tion between that committee and the Citizens' Water Company, to secure upon an equitable basis a consolidation of the Denver plant and the plant owned by that company.

In all the evidence covering these protracted struggles and negotiations, there is not a word which indicates any intention on the part of any of the participants to commit a fraud upon the American Water Works Company. It merely describes the plans and schemes and efforts by which one set of bondholders endeavored to overreach the other.

In these struggles and negotiations, Venner was a most active and conspicuous figure, not however as an officer and stockholder of The American Water Works Company, but as a bondholder. Whilst he held a few of the seven per cent., he was, as he tells us, the owner of a majority of the five per cent. bonds, and it was to secure an advantage for that class that he devoted his entire energies. The Central Trust Company, and Butler, Stillman & Hubbard, its attorneys in New York, recognized his right to be consulted and the value of his assistance. Judge Mitchell, its attorney in Denver, tells us in his deposition: "Mr. Venner was practically our client, up to the time of the proceedings in the court of appeals, and all instructions were referred to him by Butler, Stillman & Hubbard. I was introduced to him by Butler, Stillman & Hubbard in New York, and I was instructed that so far as it was proper, they desired me to do whatever he desired me to do, whatever he directed, while of course reserving to themselves the veto power if they did not approve of his suggestions. That continued from the inception of the two suits up to the time when the difficulty arose

in the court of appeals about prosecuting the writ of error."

After the Farmers' Loan and Trust Company had instituted its action and The Central Trust Company had appeared to defend against the same, he not only advanced the funds necessary to defray the legal expenses of the Central Trust Company, but his broad knowledge of the facts, his quick perception and his keen intellect furnished to its counsel the weapons with which the legal battle was fought. After the decree was entered in that action adverse to the interests of the five per cent. bondholders, it was he who caused the writ of error to be sued out, and it was through his efforts that a *supersedeas* was obtained.

During all this period the struggle, which he carried on in court with the machinery of the law, he carried on out of court with the printing press and the typewriter. Circulars and letters were poured forth by him or at his instigation, rallying the five per cent. bondholders to his standard, and endeavoring to convince all the bondholders that the policy of the seven per cent. committee would inevitably lead to the destruction of the interests of all concerned.

At the same time, both factions recognized that the logic of the situation would ultimately compel a consolidation with the Citizens' Water Company, and each was holding conference with its officers with that end in view; while that company stood upon the edge of the field, calmly watching the fray, and seeking to appropriate to itself the bone of contention on the best terms possible.

Indeed, the necessity from a common-sense standpoint of an adjustment between the seven and five

per cent. bondholders and an ultimate consolidation with The Citizens' Water Company must have been apparent to all the participants at the very initial stages of the foreclosure proceedings, for as early as September 15, 1892, Venner printed a letter to the chairman of the seven per cent. committee, in which he says: "To obtain a successful reorganization of the property it seems to me that both classes of bonds should work harmoniously together, for the reason that the five per cent. bonds are a mortgage upon a large amount of property which is not covered by the seven per cent. mortgage, and is essential to the successful operation of the plant, and necessary to have in order to make an adjustment with the rival company. It is an admitted fact that my relations with the people controlling The Citizens' Water Company are such that I can negotiate with them to better advantage than any other person now identified with this matter. The negotiations which I began with them about the first of July of this year, as well as the previous ones, attest this statement. It will also be conceded that a large portion of each issue is owned by persons whom I directly or indirectly represent, that my familiarity with all matters pertaining to the question makes it desirable that I should take an important part in the reorganization of the property." This letter upon its face indicates the characteristics of the man, which rendered any negotiations unsuccessful whilst he insisted on playing "an important part" therein.

The struggle was maintained by him until the fall of 1893, when he sailed for Europe, because, as he tells us, his health was shattered. After his departure the five per cent. bondholders organized and

appointed the five per cent. committee. The bonds of that class, which Venner had owned and which had been deposited by him as collateral, passed into the hands of other persons under the foreclosure of the liens. The purchasers at once joined the organization, and the five per cent. committee was soon able to announce that it represented practially all the bonds of that class. The influence of Venner's imperious disposition being removed, negotiations for the first time began between the two sets of bondholders with some hope of success. As we have seen, an agreement was reached in January, 1894, and shortly thereafter a plan of consolidation was agreed upon with The Citizens' Water Company.

Upon his return from Europe, Venner learned of the agreements which had been made, and bent every energy to prevent their being carried into effect. His efforts included a vain attempt, by intervening, to prevent the dismissal of the writ of error by the court of appeals, and an equally vain attempt to prosecute in the name of The American Water Works Company a writ of error from the supreme court to the court of appeals on its order of dismissal. Defeated at every turn, finally, on the 21st day of April, 1894, he took his stand on the steps of the courthouse where Sullivan, as commissioner of the court, was crying the sales, and declared the war which from that day to this he has carried on with a persistency and courage and with a skill and ability worthy of a better cause.

With the details of the negotiations and with the terms of the agreements which were reached, we are not concerned, because they affected only the parties

thereto. But with the general plan pursued we are concerned, because it was an instrumentality in divesting The American Water Works Company of its property. Of that general plan, it is sufficient to say that it had the unqualified approval of Venner himself. He saw the necessity of foreclosing both mortgages, and advised the same. He saw the necessity of the creation of the seven per cent. committee, and participated in its formation. He did not see any necessity for the creation of the five per cent. committee, because, as the owner of the majority of those bonds, he assumed to act as a committee in their behalf. He saw the necessity of the seven per cent. and and five per cent. bondholders compromising their differences, and stood ready at any time to sign an agreement, provided he should be permitted to dictate the terms. And finally he saw the necessity of a consolidation of the property of The American Water Works Company with that of The Citizens' Water Company, and proposed several plans upon which such consolidation could be effected with his consent.

Great stress has been laid upon the insolvency proceedings in the chancery court of New Jersey as being a fraudulent scheme to tie the hands of The American Water Works Company and of its officers, while it was being robbed of its property in the courts of this state. Upon all questions involved in those proceedings, The American Water Works Company and Clarence H. Venner have had their day in a court to whose jurisdiction they were peculiarly subject. But if we may inquire into the motives which caused the institution of those proceedings, and if it be conceded that they were instituted at the

instigation and for the benefit of the holders of the underlying and seven per cent. bonds, that would furnish no just ground for complaint. I am satisfied that from the time The Farmers' Loan & Trust Company proceeding was instituted until the granting of the injunction by the New Jersey court, every move which was made by Venner as an officer and stockholder of The American Water Works Company, was made, not for the protection of the interests of his corporation, but to advance his personal interest as a five per cent. bondholder, and the interests of those whom he represented. I am further satisfied that he proposed to use his position as virtual head of the corporation and his control of its management, to throw every possible obstacle in the way of the successful assertion of the rights of the holders of the underlying and the seven per cent. bonds. Under these circumstances, the holders of those bonds were perfectly justified in resorting to legal means to take the control of the corporation from the hands of an enemy who was seeking to use it solely for his own selfish purposes, and to place it in the hands of an unbiased receiver, who would be fully able to protect the interests of the corporation, and who at the same time would stand fair and impartial to the bondholders of every class. In doing this, they undoubtedly deprived Venner, as champion of the five per cent. bondholders, of the vantage ground which he had no right to occupy, but they did no injustice to The American Water Works Company. That corporation, through its receiver, was still able to interpose any defense which it might have in the foreclosure proceedings; and, if the receiver should refuse to perform his duty in the prem-

ises, the courts of New Jersey were open to any stockholder for a proceeding to compel him to keep his trust. It appears, however, from the evidence, that as a matter of fact the receiver did perform his duty in the premises; that he fully investigated the proceedings which were being had, and declined to intervene therein; and we are bound to presume that he did so because he was convinced that the interests of The American Water Works Company would not be thereby subserved.

It is further contended that the agreement between the seven and five per cent. committees, and the agreement between the reorganization committee and The Citizens' Water Company, amounted to a fraudulent combination to stifle competition in bidding at the sales of the property. Purchasers for an extensive system of water works are not found standing at every street corner, or loitering at the front door of the court house. The Farmers' Loan & Trust Company and The Central Trust Company were mere trustees, and were not charged with the duty of bidding at the sales for the purpose of protecting the bondholders. The bonds were held by numerous persons. No individual holder was probably able to purchase the entire system, and certainly no individual holder could in law or in morals be required to bid at the sale for the purpose of protecting his interest. To deny to the bondholders the right of agreement and concerted action is to deny to them the right to protect themselves; because, without agreement and concerted action on their part, there could have been only one possible bidder at the sale, namely, The Citizens' Water Company, which could have obtained the property at its own price. Nor

does the agreement between the reorganization committee and The Citizens' Water Company furnish any evidence of a fraudulent collusion. There is no evidence that The Citizens' Water Company ever intended to bid at the sale or that it was in position to become a bidder against competition. Nor is there any proof that the real value of the property was any greater than the mortgage indebtedness for which it was being sold. It seems to have been understood that the sale under the decrees was a mere legal form to transfer the naked legal title from an insolvent corporation to the bondholders, whose investment had created and represented the value of the property. Bids made at the sale were merely formal, and since no claim was ever made or can ever be made for any deficiency judgments against the corporations which issued the bonds, the bids may equitably be considered as having been for the full amount of the indebtedness secured. The negotiations, therefore, between the reorganization committee and The Citizens' Water Company virtually amounted to this: The former said to the latter: "The property of The American Water Works Company is about to be sold under the decrees of the court for the satisfaction of our claims. Intrinsically it has, perhaps, no value except the value of the specific items which go to make it up. As a water plant, it has no value above its intrinsic value, unless it falls into the hands of a company which is able to furnish sufficient capital to operate it as a competitor to you, or unless it is consolidated with your company. At the sale which is about to take place, we shall be compelled to buy it; and to make ourselves whole, we shall be compelled to organize a company

and furnish sufficient capital to operate it as a successful rival to your company. This we propose to do, unless you will agree that the property when purchased by us shall be consolidated with your property in a new company on a fair and equitable basis." When The Citizens' Water Company became convinced of the determination and ability of the reorganization committee to protect the bondholders as thus outlined, it recognized the advantage to be derived to itself from being included in an organization which would have a monopoly of the water business in the city of Denver and vicinity, and readily agreed to such terms as were satisfactory to the reorganization committee. And this brings us to the question of the inadequacy of the consideration. It is true that as compared with the stocks and bonds which were issued by The Denver Union Water Company for the property of The American Water Works Company, the bids made at the sales were merely nominal. It is earnestly insisted by counsel that the true value of the property struck off at the sales is represented by the par value of those stocks and bonds, and that the defendants by their pleadings are estopped from denying the same. In my opinion, this contention is not sound. The stocks and bonds of The Denver Union Water Company represented an element which was not struck off at the public sales. They represented not only the true value of the property of The American Water Works Company, but the price which The Citizens' Water Company was willing to pay for the purpose of extinguishing a competitor and securing a monopoly of the water business. That was an element of value which The American Water Works Company had lost by its insolvency

and its inability to maintain itself as a successful rival of the Citizens' Water Company. It was an element of value, which, when foreclosure was assured, was injected into the property by the determination of the reorganization committee and its financial ability to operate the property as a successful rival to the Citizens' Company. Those stocks and bonds, therefore, do not represent the true value of the property. The test is, what would the property have been worth to a company which proposed to purchase and operate it as The American Water Works Company intended to do, namely, as an independent and rival organization to the Citizens' Water Company; and from this standpoint there is not a particle of evidence to show that it was worth a dollar more than was bid for it.

I cannot imagine any reason why the bondholders should have desired to commit a fraud upon The American Water Works Company, unless their motive was to take advantage of the general financial depression and secure what they imagined to be an immensely valuable property for a mortgage indebtedness greatly disproportionate to the true value of that property. I do not believe this to be true. At any time during the period covered by these transactions, the bondholders, I think, would have been only to glad to surrender their securities for their face value; and I am satisfied that in proceeding as they did they were actuated only by an honest and perfectly proper desire to preserve their interests. The charges of fraud are not sustained. All there is to plaintiffs' case on this ground, is the unsparing use of the adjectives, "false," "fraudulent," "unlawful," and "collusive," with which they have

seen fit to characterize every action which they deemed adverse to their supposed rights.

These views being entertained upon the questions arising upon the case as attempted to be made out by the plaintiffs, it is unnecessary to discuss the various propositions advanced by the defendants; but I shall briefly state why in my judgement the plaintiffs cannot prevail in this action, even should I be mistaken in my conclusions upon the questions of jurisdiction previously considered.

In the first place, Venner's co-plaintiffs in this action are clearly barred by their laches. The foreclosure proceedings were instituted in 1892; final decrees were entered in 1894; and the sales were made in the same year. The present action was not instituted until 1896. The events of the period from 1892 to 1896 were either matters of public and official record or of general notority. These persons, by the exercise of that diligence which the law requires everyone to use in his business affairs, could have readily ascertained the material facts which have been detailed in evidence in this case, and must therefore be charged with knowledge thereof. They saw the foreclosure proceedings instituted and the company's property placed in the hands of a receiver. They saw the corporation in New Jersey declared insolvent, and a statutory receiver appointed to wind up its affairs. They saw the decrees entered, and the property sold and purchased by third persons. They saw it amalgamated with other property, and subjected to the lien of a mortgage to secure bonds to the amount of eight millions of dollars, which passed into the hands of innocent persons. And yet, during all of this period, they

uttered not a word of protest against the great wrongs which they now allege were committed, nor performed a single act to protect their supposed rights.

It may be said that, since relief is sought on the ground that the decrees of foreclosure are absolutely void for want of jurisdiction, the doctrine of laches has no application. However cogent this argument might be, if made by The American Water Works Company, it has no force whatever when made by these plaintiffs. They were not parties to the proceedings, and it does not lie in their mouths to speak of technical defects and legal rights. They have no legal right to attack the decrees. They are here simply by the grace of equity, and equity will demand of them as it does of every suitor, who appeals to equity alone, that they come with clean hands, with due diligence, and with a tender regard for the rights of others. Not having spoken when they should, their long silence, the changed condition of property and the intervention of the rights of third persons forbid that they should now be heard to complain.

As for Venner, he meets with an insuperable barrier in his connection with the Central Trust Company case. There can be no doubt that it was instituted at his instigation, and, as we have seen, counsel who conducted it regarded him as their client. Moreover, Judge Mitchell tells us that service of process was made upon Venner in that proceeding upon information furnished by him. There can be no question as to the character of that information. Venner was then engaged in his struggle with The Farmers' Loan & Trust Company, and he was look-

ing ahead for grounds upon which he could avoid the decree in that proceeding, if it should be adverse to his contentions. No one at that time seems to have had any doubt but that service could be made upon the vice-president of the company. Judge Mitchell undoubtedly intended to serve process upon Sullivan, and was induced by the information which he received from Venner to change his mind, and serve it upon Venner himself. The information furnished was that Sullivan had resigned as director and vice-president, and the invalidity of the service upon him for that reason, was, in my opinion, one of the points which Venner had in his mind upon which to attack The Farmers' Loan & Trust Company decree. He intended that the decree in the Central Trust Company case should be impregnable, and I believe from the evidence that the service in that proceeding was made upon him *by his own procurement*. By the plainest principles of justice, he is estopped from questioning the validity of the decree in the Central Trust Company case, and the title of The Denver Union Water Company derived under that decree.

In the second place, The American Water Works Company (of New Jersey) was an instrumentality created for the sole purpose of consolidating the Denver and ·Omaha plants under one management, in order that each might secure whatever strength could be derived from its union with the other. With the exception of the comparatively trifling sum paid for the purchase of organization stock, it had no assets except the properties of the two consolidating companies; and, with the exception of the organization stock, all that was issued was practically substituted

for the stock of those two companies.  On April 22, 1895, when the decree of the circuit court of the United States for the district of Nebraska was rendered, it was discovered that no consolidation had in fact ever been effected; that The American Water Works Company (of Illinois) had never in fact conveyed its property to the New Jersey corporation; that The Denver City Water Works Company had been made the victim of a legal fraud; and that upon considerations and conditions representedas existing, but which in fact never existed, it had been induced to convey all of its property to the New Jersey company, receiving in return about one-half of the capital stock which that company issued, while the remainder was issued to the Illinois company without any consideration whatever.

That The American Water Works Company (of New Jersey) could be permitted to retain property acquired under such circumstances is inconceivable. Assuming, for the sake of argument, that its title thereto had not been divested by the foreclosure proceedings involved in this controversy, immediately upon the rendition of the decree by the federal court, it was its bounden duty to re-convey the title which it had received to The Denver City Water Works Company.  Failing so to do in equity it became at once a mere depositary of the naked legal title, while the beneficial interest vested in its true owner, The Denver City Water Works Company.

Counsel for plaintiffs contend that we have no right to inquire as to whether the stock issued to the Illinois company was based upon a sufficient consideration.  For the sake of argument, let it be conceded; that the persons owning the same are *bona*

*fide* stockholders. As such they have the right to share in whatever belongs to The American Water Works Company (of New Jersey), provided it belongs to that corporation in substance as well as in name. They have no right to share in the property of other persons, the naked title to which happens by an accident, so to speak, to stand in the name of the New Jersey company. They have no more right to share in the Denver plant than they would have to share in the fruits of an actual fraud committed by their officers in the name of the company. The plaintiffs, therefore, have no beneficial interest whatever in the property involved in this controversy.

Moreover, stockholders, as such, have no legal right to sue or defend on behalf of the corporation. Every person who becomes a stockholder thereby consents that the affairs of the company shall be managed and controlled by the governing body. Whether a suit shall be brought or an action be defended rests within the sound discretion of the governing body; and as long as that discretion is honestly exercised, the stockholder has no right to complain, nor will the courts interfere at his instance and on his behalf. The right of a stockholder to institute an action in equity on behalf of the corporation cannot be predicated upon the mere refusal or failure of the governing body to institute such action; because such refusal or failure may be entirely right and proper, and may represent the best interests of the corporation. The refusal or failure to act which authorizes the stockholder to proceed must, then, be such as involves a breach of duty and amounts to an actual or constructive fraud or wrong upon the cor-

poration and its stockholders. But a fraud or wrong upon a corporation and its stockholders cannot be predicated upon the refusal of the governing body to institute an action to set aside a righteous judgment on purely technical grounds, because fraud and wrongdoing can never be predicated upon an act of common honesty. It seems to me, therefore, clear on principle that in an action brought by a stockholder on behalf of his corporation, where no fraud is shown, he cannot be permitted to attack the validity of a meritorious judgment or decree upon purely technical grounds, when the corporation itself, through its governing body, has refused to take advantage of such technical defects.

That is precisely the case here presented. Before beginning this action, the plaintiffs requested the receiver to institute the same. In the exercise of the discretion vested in him, as representing the corporation, he refused. A petition was then filed in the court of chancery by which the receiver was appointed seeking an order to compel him to proceed. After various steps, the matter was referred to a master in chancery, before whom a full hearing was had. Everything that the ingenuity and learning of counsel, assisted by Venner's comprehensive knowledge of the facts, could suggest was brought to bear upon the master. Every objection to the decrees of foreclosure, technical or otherwise, which have been urged in this case, and every possible advantage that could accrue to the corporation by successfully prosecuting such an action were presented as forcibly as they could be presented. The result of the hearing was that the master emphatically sustained the receiver in his refusal. From

the report filed, it is evident that the action of the receiver and of the master was based upon the ground that, even if the decrees of foreclosure could be avoided because of technical defects, the victory would be a barren one to the stockholders and general creditors of the corporation, inasmuch as they were based on valid mortgages securing an indebtedness equal to if not greater than the value of the property sold. The evidence in this case, in my opinion, fully supports the conclusion of the master as to the equities of the situation; and from the evidence I believe that the receiver, in refusing to institute this proceeding, acted not only in good faith but with sound discretion. If this finding be correct, the plaintiff's case is ended. I base this conclusion not upon the statute of New Jersey, but upon general principles of equity. If in an action by stockholders on behalf of the corporation the court finds from the evidence that the governing body of the corporation acted properly and rightly in refusing to institute the action, and that even a successful prosecution of the suit would be barren of beneficial results to the corporation and its stockholders, then the whole basis of the stockholders' right in equity to maintain the action is swept away, and it must fail.

The question of fraud being eliminated by the findings made, I am satisfied, for the reasons indicated, that the plaintiffs have no standing in this court to question the validity of the decrees of foreclosure.

As between the plaintiff and defendants, the court finds that the plaintiffs are not entitled to the relief prayed for or to any other relief, and that their complaint should be dismissed, and that the defend-

ants should have judgment for their costs.

As between the cross-complainants and The American Water Works Company (of New Jersey) and the receiver thereof, the court finds that The Denver Union Water Company is the owner in possession of the property in controversy and should have its title thereto quieted. The costs of the cross-complaint should be taxed against the Denver Union Water Company. A decree will be entered accordingly.